UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN HONDA FINANCE CORPORATION and HVT, INC.,

Plaintiffs,

-against-

THE CITY OF NEW YORK,

Defendant.

Case No. 1:24-cv-01137 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Plaintiffs American Honda Finance Corporation ("AHFC") and HVT, Inc. ("HVT" and together with AHFC, "Plaintiffs") bring this action against Defendant The City of New York ("Defendant" or the "City") pursuant to the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, as well as the corresponding protections of the New York State Constitution, seeking to recover damages associated with ten vehicles that the City disposed of pursuant to its derelict vehicle removal policy and program (each, a "Vehicle," and together, the "Vehicles"). *See generally* Dkt. 1 ("Compl." or the "Complaint").

Now before the Court are the parties' cross-motions for summary judgment under Federal Rule of Civil Procedure ("Rule") 56, *see* Dkt. 43 ("Pls. Mot.") (moving for summary judgment on all claims); Dkt. 53 ("Def. Mot.") (moving for partial summary judgment on Fourth and Fifth Amendment claims). For the reasons that follow, the Court GRANTS Plaintiffs summary judgment on their Fourteenth Amendment claim, as well as nominal damages on the same; GRANTS Defendant summary judgment on Plaintiffs' Fourth Amendment and New York State Constitution claims, as well as all claims concerning the Cruz Vehicle; and GRANTS in part and DENIES in part summary judgment for both parties on the Fifth Amendment claim. The parties' motions are otherwise DENIED.

## BACKGROUND

The Court draws the following facts from the parties' submissions in support of their respective motions for summary judgment, including the parties' Local Rule 56.1 statements and responses. *See* Dkt. 44 ("Pls. Br."); Dkt. 45 ("Pls. SUF"); Dkt. 55 ("Def. SUF"); Dkt. 56 ("Def. RSUF"); Dkt. 57 ("Def. Br."); Dkt. 60 ("Pls. Reply"); Dkt. 61 ("Pls. RSUF"); Dkt. 65 ("Def. Reply").[1] The Court also draws from the declarations of Michelle Smith, Nicholas Duston,

[1] This Court's Individual Rules require parties moving for summary judgment to "negotiate and submit, prior to or along with the movant's Rule 56.1 Statement, a joint Rule 56.1 Statement setting out all facts on which the parties agree." Ind. R. 3.I.iii. The parties did not comply with that requirement. Instead, Plaintiffs filed a 107-paragraph statement of material facts, *see* Pls. SUF, Defendant filed a separate 140-paragraph statement, *see* Def. SUF, and each side then filed a lengthy response to the other's statement, *see* Def. RSUF; Pls. RSUF. Many of the responses do little more than object to the relevance or legal significance of an asserted fact, add immaterial clarification, or dispute a legal characterization while conceding the underlying event. *See, e.g.*, Pls. RSUF ¶¶ 2, 11, 94; Def. RSUF ¶¶ 15, 81, 85. And several of the responses are admissions. *See, e.g.*, Def. RSUF ¶¶ 1-8, 12-13, 20-21, 36-37, 44-47, 51-54, 102-03; Pls. RSUF ¶¶ 18-22, 30-31, 33-34, 78-81, 129-30, 134-40. The resulting submissions unnecessarily complicated the task that a joint statement was intended to simplify.

The Court has nevertheless reviewed the parties' submissions and the cited record to determine which facts are genuinely disputed. Unless otherwise noted, where only one party's Local Rule 56.1 Statement is cited, the other party either does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely offers additional evidence clarifying the fact. *See Ali v. Szabo*, 81 F. Supp. 2d 447, 450 n.2 (S.D.N.Y. 2000) (deeming Rule 56.1 statements admitted where plaintiff "only 'objected to' or 'clarified' certain paragraphs of defendants' Rule 56.1 statement"); *Mar-Can Transp. Co. v. Local 854 Pension Fund*, 722 F. Supp. 3d 355, 358 n.1 (S.D.N.Y. 2024) ("Where a statement in a party's Rule 56.1 Statement is properly supported, and the other side does not specifically deny it with evidence, the statement is deemed admitted for purposes of this motion." (emphasis omitted)); *see also* Loc. Civ. R. 56.1(c)-(d) (providing that each statement of fact set forth "by the moving party will be deemed to be admitted for purposes of the motion unless specifically *controverted* by . . . the opposing party" with "citation to evidence which would be admissible" (emphasis added)). The Court does not treat a party's disagreement over the legal consequences of an otherwise undisputed event as creating a genuine dispute of fact.

"[U]nder Rule 56(c), the Court can [also] consider, among other things, depositions, interrogatory answers, and admissions in deciding a summary judgment motion." *InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 558 (S.D.N.Y. 2021); *see also* Fed. R. Civ. P. 56(c) (providing that a party may assert facts by citing to, *inter alia*, "depositions, documents,

Rudolph Meola, and Jay Cullen, and the exhibits attached thereto. *See* Dkt. 43-1 ("Smith Decl."); Dkt. 43-2 ("Duston Decl."); Dkt. 47 ("Meola Decl."); Dkt. 54 ("Cullen Decl."); Dkt. 64 ("Cullen Reply Decl.").

## I. Factual Background

### A. Plaintiffs and Their Interests in the Vehicles

AHFC finances motor vehicle purchases. Def. RSUF ¶ 1. In the ordinary course of its business, it takes assignments of retail installment contracts and holds liens in the financed vehicles as security for repayment. *Id.* HVT conducts a related leasing business and holds title to vehicles during the terms of its leases. *Id.* ¶ 2. Plaintiffs regularly finance or lease thousands of vehicles in New York. *See id.* ¶¶ 101-03.

This action concerns ten of those vehicles: (1) a 2016 Honda Pilot bearing VIN 5FNYF6H51GB105534 (the "Cruz Vehicle"); (2) a 2018 Honda Civic bearing VIN SHHFK7H59JU413551 (the "Griffin Vehicle"); (3) a 2015 Honda Accord bearing VIN 1HGCR2F38FA215873 (the "Khan Vehicle"); (4) a 2016 Honda Accord bearing VIN 1HGCR2F33GA161075 (the "Smith Vehicle"); (5) a 2017 Honda Accord bearing VIN 1HGCR2F53HA213582 (the "Vasquez Vehicle"); (6) a 2020 Honda CR-V bearing VIN 2HKRW2H51LH659777 (the "Beatty Vehicle"); (7) a 2020 Honda Accord bearing VIN 1HGCV1F32LA098826 (the "Jones Vehicle"); (8) a 2021 Honda Accord bearing VIN 1HGCV1F40MA030678 (the "Philbert Vehicle"); (9) a 2021 Honda Civic bearing VIN 2HGFC2F6XMH500730 (the "Rodriguez Vehicle"); and (10) a 2022 Acura MDX bearing VIN 5J8YE1H48NL009540 (the "Salgado Vehicle"). *Id.* ¶ 4. AHFC held perfected liens on five of the Vehicles — the Cruz, Griffin, Khan, Smith, and Vasquez Vehicles. *See id.* ¶¶ 12, 20, 28, 36,

electronically stored information, affidavits or declarations, stipulations . . . , admissions, [and] interrogatory answers").

44. Four others — the Beatty, Jones, Rodriguez, and Salgado Vehicles — were leased vehicles titled to HVT. *See id.* ¶¶ 47, 51, 54, 58, 68, 72, 75, 79. Honda Lease Trust ("HLT") held title to the remaining vehicle, the Philbert Vehicle. *See id.* ¶¶ 61, 65; Pls. RSUF ¶¶ 96-97. Plaintiffs assert that HVT serves as trustee of HLT and AHFC administers the Philbert Vehicle lease, thereby authorizing Plaintiffs to act on HLT's behalf. *See* Pls. SUF ¶ 60 n.2. The City does not dispute that HLT held title to the Philbert Vehicle before its removal. *See* Def. RSUF ¶ 65. Nor does it challenge HVT's capacity or authority to pursue claims concerning the Philbert Vehicle on HLT's behalf. *See* Dkt. 70 ("Tr.") at 36:14-23; *see also UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, --- F.4th ---, 2026 WL 2339538, at *6 (2d Cir. Aug. 13, 2026) ("[W]here a trustee sues in its capacity as trustee on behalf of a trust, the trustee need not have personally suffered a cognizable injury." (emphasis omitted)).

The relevant borrower or lessee for all the Vehicles had already defaulted before the City took any action with respect to the Vehicles. *See* Def. RSUF ¶¶ 10, 18, 26, 34, 42, 49, 56, 63, 70, 77. And the governing contracts for the Vehicles permitted AHFC, HVT, or HLT, as applicable, to repossess the Vehicles upon default. *See id.* ¶¶ 11, 19, 27, 35, 43, 50, 57, 64, 71, 78.

### B. New York Vehicle and Traffic Law § 1224 and the City's Derelict Vehicle Operations Policy

New York Vehicle and Traffic Law § 1224 ("Section 1224") governs abandoned vehicles. *See* N.Y. Veh. & Traf. Law ("VTL") § 1224 (McKinney 2002). Section 1224 was amended in 2025, but the Court, unless otherwise specified, refers to the 2002 version of the statute, which was in effect when the City removed the Vehicles. Relevant here, under Section 1224(1), a motor vehicle is "deemed to be an abandoned vehicle if left unattended . . . with no [license] plate[] affixed thereto, for more than six hours on any highway or other public place."

VTL § 1224(1)(a); Pls. RSUF ¶ 1. Section 1224(2) addresses a narrower category of abandoned vehicles. During the applicable time period, it provided that "[i]f an abandoned vehicle, at the time of abandonment, ha[d] no [license] plate[] affixed and [wa]s of a wholesale value, taking into consideration the condition of the vehicle, of one-thousand two hundred fifty dollars or less, ownership [would] immediately vest in the local authority having jurisdiction thereof." VTL § 1224(2); Pls. RSUF ¶ 2.[2] The statute further provided that the local authority need not obtain title if the vehicle would "be sold or otherwise disposed of as junk or salvage, dismantled for use other than as a motor vehicle, or otherwise destroyed." VTL § 1224(2); Pls. RSUF ¶ 2.

For abandoned vehicles outside of Section 1224(2), the local authority generally must inquire into ownership, notify the last owner, and, if informed of an existing lien or mortgage, notify the lienholder or mortgagee. *See* VTL § 1224(3)(a)-(c); Pls. RSUF ¶ 4. Section 1224(2) vehicles were exempt from that procedure. *See* VTL § 1224(3)(a); Pls. RSUF ¶ 4.

New York City's Administrative Code assigns the City's Department of Sanitation ("DSNY") responsibility for determining whether certain vehicles qualify as abandoned under Section 1224 and for removing those that do. Pls. RSUF ¶¶ 5-8. DSNY adopted Policy and Administrative Procedure 2023-04, *see* Cullen Decl., Ex. B ("DVO Policy"), to establish criteria for identifying and removing such vehicles. Pls. RSUF ¶ 8; *see* DVO Policy at CNY0066. DSNY followed the DVO Policy for each of the Vehicles. Pls. RSUF ¶ 29.

During the relevant period, the DVO Policy set forth a series of criteria to determine whether a vehicle fell under Section 1224. At the outset, a DSNY officer inspecting a vehicle on the street would determine if it met the City's definition of a derelict vehicle. *See* DVO Policy at

[2] The 2025 amendment to Section 1224(2) raised the wholesale value threshold to "two thousand two hundred and fifty dollars or less." *See* VTL § 1224(2) (McKinney 2025); Pls. RSUF ¶ 3.

CNY0066-67; Cullen Decl., Ex. E ("Scully Dep.") at 31:3-21, 35:6-10.[3] The factors relevant to that assessment were set forth in a DS-12 form, which expanded upon the requirements set forth in Section 1224. Pls. RSUF ¶ 11; *see* DVO Policy at CNY0066, CNY0077-79; *see also* VTL §§ 1224(1)(a), (2) (requiring that a vehicle be "left unattended . . . with no [license] plate[] affixed thereto, for more than six hours on any highway or other public place" and be "of a wholesale value, taking into consideration the condition of the vehicle, of one thousand two hundred fifty dollars or less"). The DS-12 form included factors such as whether the vehicle is "seriously burned," whether it is a "luxury vehicle," the vehicle's age, the availability of a VIN, and the number and nature of damaged components. *See* DVO Policy at CNY0077-78; Pls. RSUF ¶ 13. Through these factors, DSNY officers "reasonably approximate[d] the definition of wholesale value as set forth in Section 1224," rather than "place a dollar value on [the] derelict vehicle." DVO Policy at CNY0066; *see* Scully Dep. at 56:8-14. The City maintains, however, that a determination that a vehicle was "derelict" under the DVO Policy necessarily reflected DSNY's determination that the vehicle fell below Section 1224(2)'s $1,250 wholesale-value threshold. *See* Def. RSUF ¶ 85(A).

If a vehicle met the DS-12 criteria, then the DSNY officer would identify it as derelict. *See* Scully Dep. at 38:2-13; DVO Policy at CNY0067, CNY0080. Otherwise, the vehicle would be referred to the NYPD and tagged as an NYPD rotation tow. *See* Pls. RSUF ¶ 14; DVO Policy at CNY0074; Scully Dep. at 35:6-15. This assessment was documented in a DS-463 form,

[3] Both a "derelict vehicle" under the DVO Policy and an "abandoned vehicle" under Section 1224 are defined as a vehicle lacking license plates that is left unattended for more than six hours on a city street, but the notable difference between the two is that the term "derelict vehicle" also incorporates by reference the DVO Policy's criteria for assessing vehicles. *See* DVO Policy at CNY0066, CNY0077-79; VTL § 1224(1)(a). Additionally, Section 1224 supplies alternative definitions for an "abandoned vehicle" that are neither subject to the DVO Policy nor applicable here. *See* VTL § 1224(1)(b)-(d); *see generally* DVO Policy.

which consisted of nineteen fields. *See* Pls. RSUF ¶ 15; DVO Policy at CNY0080. Among them was a field concerning the vehicle's physical condition. *See* DVO Policy at CNY0080; Pls. RSUF ¶ 16. If the DSNY officer identified the vehicle as derelict, then the officer would affix a tag to the vehicle, mark the vehicle with yellow oil crayon, and enter the vehicle's information into the City's computer system. *See* Pls. RSUF ¶¶ 17-18; Def. RSUF ¶ 85(B); Scully Dep. at 38:2-13, 39:4-8; DVO Policy at CNY0068-69. After six hours, the system would generate a DS-464 form, which authorized a towing contractor to remove the vehicle within forty-eight hours of receiving the form. *See* Def. RSUF ¶ 85(C)-(D); Pls. RSUF ¶ 20; DVO Policy at CNY0069-70; Scully Dep. at 39:6-24, 42:12-16. The City would then take ownership of the vehicle pursuant to Section 1224(2). *See* Scully Dep. at 21:21-25 ("[O]nce the vehicle is removed from a city street that's deemed derelict and abandoned, the City takes ownership of it, and then once the City takes ownership of it, brings it back to the contractor's [tow] yard[.]"); *id.* at 107:11-16; *see also* VTL § 1224(2). Once the City's contractors transported the vehicle to a tow yard, a DSNY supervisor would conduct a secondary review of the vehicle to ensure that it met the DS-12 criteria, classifying the vehicle as either a "hold" or a "pass." *See* Pls. RSUF ¶¶ 22, 24; Def. RSUF ¶ 85(E); Scully Dep. at 43:6-19. During this review process, the City permitted persons or entities to claim the vehicle by presenting proof of ownership and arranging for the vehicle's lawful removal from the tow yard. Pls. RSUF ¶ 23. The DVO Policy, however, did not direct DSNY to identify lienholders or lessors through the vehicle's VIN or to provide them individualized notice that a vehicle had been removed. Def. RSUF ¶ 83.

If a person contacted or appeared at the yard to claim a vehicle, or if the DSNY supervisor concluded that it did not satisfy the DS-12 criteria, then the vehicle would be placed on "hold." Def. RSUF ¶ 85(F); *see* Scully Dep. at 20:17-21:9, 45:3-11. In contrast, a "pass" designation reflected the DSNY supervisor's conclusion that the vehicle satisfied the DS-12

criteria, Section 1224, and the applicable City regulation. Pls. RSUF ¶ 25; *see* Def. RSUF ¶ 85(G); Scully Dep. at 21:9-12.

Once a vehicle received a "pass" designation, DSNY completed an MV-109 salvage form, which "transferr[ed] titleship [of the vehicle] over to the [City's] contractor . . . to be dismantled and disposed of" that same day. Scully Dep. at 22:2-7, 77:6-8; *see* Pls. RSUF ¶ 26; Def. RSUF ¶ 85(G) (noting that title to vehicles is transferred "free of any previous property interests").[4] Any usable parts would be sold, and the remainder would be scrapped. Def. RSUF ¶ 85(H). The City paid its contractors five dollars per vehicle for their work in support of the DVO Policy. Pls. RSUF ¶ 28.

### C. The Vehicles

The City's records reflect that each of the Vehicles was found unattended on a New York street without a license plate. *See* Pls. RSUF ¶¶ 34, 43, 52, 62, 72, 81, 90, 98, 107, 116; Cullen Decl., Ex. A at CNY0023, CNY0027, CNY0031, CNY0036, CNY0040, CNY0045, CNY0049, CNY0052, CNY0056, CNY0061. After the applicable six-hour waiting period, one of the City's contractors removed each Vehicle. *See* Pls. RSUF ¶¶ 36, 45, 55, 65, 74, 83, 92, 100, 109, 118; *see also id.* ¶ 21; Def. RSUF ¶ 84. The relevant removal dates were as follows:

| Vehicle | Removal Date |
|---|---|
| Cruz | November 25, 2019 |
| Khan | June 8, 2021 |
| Beatty | June 17, 2022 |
| Rodriguez | September 19, 2022 |
| Salgado | October 12, 2022 |
| Smith | May 10, 2023 |
| Vasquez | May 10, 2023 |
| Jones | August 22, 2023 |
| Philbert | January 24, 2024 |
| Griffin | February 7, 2024 |

[4] Plaintiffs dispute that the City could transfer title to its contractor because, they argue, the DVO Policy cannot lawfully vest title in the City in the first place. *See* Pls. RSUF ¶ 26.

See Pls. RSUF ¶¶ 36, 45, 55, 65, 74, 83, 92, 100, 109, 118.

DSNY reported significant physical damage to each Vehicle, although the nature and degree varied. The Cruz and Salgado Vehicles showed extensive fire damage. *See id.* ¶¶ 73, 117. The Smith and Vasquez Vehicles were missing all four wheels and had sustained damage to, among other things, their engines, interiors, and body components. *See id.* ¶¶ 53-54, 63-64. DSNY described the Beatty and Rodriguez Vehicles as substantially stripped, with missing doors or wheels and damage to their engines, interiors, and exterior components. *See id.* ¶¶ 82, 108. The Griffin, Khan, Jones, and Philbert Vehicles likewise had multiple categories of reported damage, including damaged or missing body, engine, interior, glass, or airbag components. *See id.* ¶¶ 35, 44, 91, 99. Plaintiffs admit that DSNY's records contain those descriptions but state that they cannot independently verify the Vehicles' condition because the Vehicles no longer exist. *See, e.g.*, *id.* ¶¶ 35, 44, 53-54, 63-64, 73, 82, 91, 99, 108, 117.

Given the aforementioned damage, a DSNY supervisor classified each of the Vehicles as a "pass." *Id.* ¶ 27. The City maintains that each designation reflected a determination that the Vehicle had a wholesale value of $1,250 or less and thus satisfied Section 1224(2). *See id.* ¶¶ 37, 46, 56, 66, 75, 84, 93, 101, 110, 119. Plaintiffs admit that DSNY made those determinations but dispute whether the City's methodology complied with Section 1224 and whether the Vehicles in fact fell below the statutory threshold. *See id.*; *see also* Def. RSUF ¶ 85(A). In support of their position, Plaintiffs offer the opinion of Paul Fallati ("Fallati"). Plaintiffs retained Fallati to estimate the Vehicles' values based on their associated DSNY records. *See* Duston Decl., Ex. G ("Fallati Rep.") at 2. Fallati provided the following estimates:

| Vehicle | Fallati Estimate |
|---|---|
| Cruz | $250.00 |
| Khan | $1,586.41 |
| Beatty | $1,903.33 |
| Rodriguez | $2,389.95 |
| Salgado | $250.00 |
| Smith | $3,566.54[5] |
| Vasquez | $4,550.58 |
| Jones | $6,184.20 |
| Philbert | $5,329.44[6] |
| Griffin | $3,926.99 |
| **Total** | **$29,937.44** |

*See id.* at 3; *see also* Def. RSUF ¶ 91.

Fallati arrived at those estimates by assigning values to components that he understood the City's inspection materials to identify as undamaged. *See* Fallati Rep. at 2; Def. RSUF ¶¶ 92-94. The City disputes both that factual assumption and Fallati's measure of value. According to the City, the inspection sheets identify damage that DSNY personnel observed but do not establish that an unchecked component was undamaged. *See* Def. RSUF ¶¶ 87, 92, 95. The City further contends that Section 1224 asks for the wholesale value of the entire vehicle, rather than the aggregate retail value of individual components. *Id.* ¶ 94. In the City's view, each "pass" designation itself reflects a valuation of no more than $1,250. *Id.* ¶ 95. The actual wholesale value of the Vehicles is thus disputed. *See id.* ¶ 91.

It is, however, undisputed that the City paid Plaintiffs no compensation for the Vehicles, *id.* ¶ 89, that Plaintiffs did not request that any of the Vehicles be destroyed, *id.* ¶ 90, and that Plaintiffs learned of the City's actions only after each of the Vehicles had already been dismantled or destroyed, *id.*

[5] Plaintiffs' Rule 56.1 statement incorrectly identifies this estimate as "$3,566.53." Pls. RSUF ¶ 91.

[6] Plaintiffs' Rule 56.1 statement incorrectly identifies this estimate as "$5,329.40." *Id.*

### D. DSNY's Revised Rule

Nearly two years after the City disposed of the last of the Vehicles pursuant to the DVO Policy, DSNY changed its procedures. On December 16, 2025, DSNY proposed a rule that would add notice and hearing procedures for owners, lienholders, and other interested parties following removal of a derelict vehicle. Pls. RSUF ¶ 129. DSNY received public comments and held a hearing to discuss the proposed rule on January 15, 2026. *Id.* ¶¶ 130, 133. On January 23, 2026, DSNY promulgated a final rule entitled "Notice and Hearing Requirements for Abandoned Vehicles." *Id.* ¶ 134; *see* Cullen Decl., Ex. K ("Revised Rule").

The Revised Rule directs DSNY to provide ascertainable owners and interested parties notice by certified mail, return receipt requested, or, when authorized, email. Pls. RSUF ¶ 135; Revised Rule at 4. The notice includes information regarding the vehicle's condition, removal date, and redemption and applicable towing and storage fees, as well as instructions for requesting a hearing to challenge the vehicle's removal or the imposition of fees. Pls. RSUF ¶ 135; Revised Rule at 5. An interested party has ten days to request a hearing; DSNY must then schedule the hearing within seventy-two hours and issue a decision within five business days. Pls. RSUF ¶¶ 136-38; Revised Rule at 6-7. That decision constitutes a final agency determination reviewable in an Article 78 proceeding. Pls. RSUF ¶ 139; Revised Rule at 7. The Revised Rule also provides that title or proof of a lien generally constitutes "'adequate proof' that an 'interested party is lawfully entitled to redeem possession of the subject abandoned vehicle.'" Pls. RSUF ¶ 140 (quoting Revised Rule at 7). Because the Revised Rule post-dated the disposal of the Vehicles, its procedures did not apply to any of them.

## II. Procedural History

Plaintiffs commenced this action against the City on February 16, 2024, pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging violations of the Fourth, Fifth, and Fourteenth

Amendments to the United States Constitution, as well as the corresponding portions of the New York State Constitution. *See* Compl. ¶¶ 41-73. They seek damages resulting from the City's destruction of the Vehicles, a declaration that the DVO Policy is unconstitutional, and a permanent injunction against further implementation of the DVO Policy. *Id.* ¶¶ 49-50, 60-61, 70-71.

On November 10, 2025, Plaintiffs moved for summary judgment on all claims and for the relief sought in the Complaint. Pls. Mot.; Pls. Br.; Pls. SUF. Defendant filed its joint cross-motion for partial summary judgment on the Fourth and Fifth Amendment claims and opposition to Plaintiffs' motion on January 26, 2026. Def. Mot.; Def. Br.; Def. SUF; Def. RSUF. Plaintiffs submitted their joint opposition to Defendant's motion and reply in further support of their motion on April 2, 2026. Pls. Reply; Pls. RSUF. And Defendant submitted its reply in further support of its motion on May 18, 2026. Def. Reply. Both motions are fully briefed.

On September 15, 2026, the parties appeared before the Court for oral argument on their respective summary judgment motions. *See* Tr.

**LEGAL STANDARD**

Under Rule 56, a moving party is entitled to summary judgment if, on any claim or defense, that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it 'might affect the outcome of the suit under the governing law[,]' [and] [a] dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Rosen v. UBS Fin. Servs. Inc.*, No. 22-cv-03880 (JLR), 2023 WL 6386919, at *4 (S.D.N.Y. Sept. 29, 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In other words, "[t]here is 'no genuine dispute as to any material fact' where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable

fact-finder could never accept the nonmoving party's version of the facts . . . ; or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law." *SEC v. Cole*, No. 12-cv-08167 (RJS), 2015 WL 5737275, at *3 (S.D.N.Y. Sept. 19, 2015) (citation omitted) (first citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); and then citing *Liberty Lobby*, 477 U.S. at 248).

At summary judgment, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Estate of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)). "On cross-motions for summary judgment, each moving party 'has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor.'" *Cole*, 2015 WL 5737275, at *3 (quoting *McDonnell v. First Unum Life Ins. Co.*, No. 10-cv-08140 (RPP), 2013 WL 3975941, at *13 (S.D.N.Y. Aug. 5, 2013)). To defeat a motion for summary judgment, the nonmoving party must advance more than "a scintilla of evidence," *Liberty Lobby*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec.*, 475 U.S. at 586.

## DISCUSSION

### I. Threshold Issues

Before turning to the merits of Plaintiffs' constitutional claims, the Court addresses several threshold issues that bear on the scope of those claims. First, the Court considers the City's argument that Plaintiffs' failure to challenge the constitutionality of Section 1224 itself forecloses Plaintiffs' claims because, once the statute's conditions were satisfied, Plaintiffs' property interests were necessarily extinguished and ownership of the Vehicles vested in the City. *See* Def. Br. at 9-10, 15, 20-22; Def. Reply at 2-4. Second, the Court addresses whether,

under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the City may be held liable for conduct undertaken pursuant to a state-law scheme. Def. Br. at 23-24; Def. Reply at 2-4. Third and finally, the Court evaluates the City's statute-of-limitations defense as to the Cruz Vehicle. Def. Br. at 22-23; Def. Reply at 9. As explained below, neither of the first two issues categorically bars Plaintiffs' claims, but all claims concerning the Cruz Vehicle are untimely.

**A. The City's Arguments Concerning Section 1224**

*1. Plaintiffs Have a Protected Property Interest*

The Court begins with the City's arguments regarding Plaintiffs' property interests in the Vehicles. "Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law[.]" *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *accord O'Connor v. Pierson*, 426 F.3d 187, 196 (2d Cir. 2005). "[Y]et the process due when they are deprived through state action is governed by federal constitutional law." *Behrend v. Klein*, Nos. 04-cv-05413 (NGG) (CLP) & 04-cv-05414 (NGG) (CLP), 2010 WL 627696, at *6 (E.D.N.Y. Feb. 22, 2010). As the Supreme Court has explained, "'[p]roperty' cannot be defined by the procedures provided for its deprivation[.]" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (rejecting the proposition that state-created procedures define the scope of federal due-process protection). Nor may a State "sidestep the Takings Clause by disavowing traditional property interests" long recognized under state law. *Moore v. Harper*, 600 U.S. 1, 35 (2023) (quoting *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 167 (1998)); *see Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980) ("[A] State, by *ipse dixit*, may not transform private property into public property without compensation[.]").

During the relevant period, Section 1224(1) deemed a vehicle abandoned if it was left unattended without license plates for more than six hours on a highway or other public place.

*See* VTL § 1224(1). Section 1224(2) further provided that, if such a vehicle had a wholesale value of $1,250 or less, "ownership shall immediately vest in the local authority having jurisdiction thereof." *Id.* § 1224(2). And vehicles governed by Section 1224(2) were exempt from the notice procedure that Section 1224(3) imposed for other abandoned vehicles. *Id.* § 1224(3).

The City argues that these provisions resolve this case. According to the City, once each Vehicle satisfied Section 1224(2), ownership vested in the City by operation of law, any antecedent interest of Plaintiffs ceased to exist, and the City could dispose of its own property without providing Plaintiffs with notice, a hearing, or compensation. Def. Br. at 9, 15, 20-22; Def. Reply at 2-4. The City presses the point further in its reply brief, contending that Plaintiffs' decision not to challenge the constitutionality of Section 1224 is "fatal" to their claims. Def. Reply at 2 (capitalization omitted). The Court disagrees with that categorical proposition.

Plaintiffs challenge the procedures by which the City determined that the Vehicles qualified for treatment under Section 1224(2) and the lack of notice and hearing that rendered that determination effectively irreversible. *See* Pls. Reply at 3-5. Their theory does not require the Court to hold Section 1224 facially unconstitutional. Indeed, the Court assumes for purposes of the present motions that Section 1224 validly permits ownership to vest in the City when its statutory predicates have been established. The constitutional question remains whether the City could conclusively establish those predicates — and thereby extinguish recorded title and lien interests — through a process that afforded the holders of those interests no individualized notice and no opportunity to contest the City's determination before the Vehicles were transferred and dismantled.

That distinction matters here because, under Section 1224(2), there are conditions that need to be met to trigger the transfer of property rights in a given vehicle to the City. The statute

required, among other conditions, that the vehicle have a wholesale value of $1,250 or less, *see* VTL § 1224(2), and the City adopted the DVO Policy to determine whether that condition was met, *see* DVO Policy at CNY0066. A DSNY officer would first evaluate a vehicle under the City's criteria, Scully Dep. at 35:6-10, 37:23-38:13, and, after the vehicle was removed, a DSNY supervisor would classify the vehicle as a "hold" or a "pass." *See id.* at 43:6-19; *see also id.* 44:19-45:2; Pls. RSUF ¶¶ 22, 24; Def. RSUF ¶ 85(E). A "pass" classification meant, in the City's view, that the vehicle satisfied Section 1224(2). Pls. RSUF ¶ 25; *see* Def. RSUF ¶ 85(G); Scully Dep. at 21:9-12. The City then transferred such a vehicle to its contractor "free of any other previous property interests," after which the vehicle was dismantled, its usable parts sold, and the remainder scrapped. Def. RSUF ¶ 85(G); *see id.* ¶ 85(H); Scully Dep. at 22:2-7, 77:6-8; Pls. RSUF ¶ 26. Those are municipal determinations implementing Section 1224. Plaintiffs may challenge whether the Constitution permits the City to make that valuation determination conclusive, as against a recorded lienholder or titled owner, without notice or an opportunity to be heard even if they are not challenging the constitutionality of Section 1224 itself.

### 2. *Plaintiffs'* Monell *Claims Are Not Categorically Barred*

The City relatedly argues that Plaintiffs cannot establish municipal liability under *Monell v. Department of Social Services*, because the DVO Policy merely implemented Section 1224. Def. Br. at 23-24; Def. Reply at 2-4. That argument sweeps too broadly.

"Section 1983 grants a right of action to any 'citizen of the United States or other person within the jurisdiction thereof' who has been deprived of 'any rights, privileges, or immunities secured by the Constitution' or federal law by a person acting under color of state law." *Hirsch v. City of New York*, 300 F. Supp. 3d 501, 508 (S.D.N.Y. 2018) (quoting 42 U.S.C. § 1983), *aff'd*, 751 F. App'x 111 (2d Cir. 2018) (summary order). A municipality may be liable under Section 1983 "when execution of a government's policy or custom" causes the deprivation of a

federal right. *Monell*, 436 U.S. at 694-95; *see Dudek v. Nassau Cnty. Sheriff's Dep't*, 991 F. Supp. 2d 402, 411 (E.D.N.Y. 2013) ("A municipality may be liable under Section 1983 for any policy or custom that causes a deprivation of rights protected by the Constitution." (quotation marks and citation omitted)). When the asserted municipal policy implements state law, the Second Circuit asks "whether a municipal policymaker has made a meaningful and conscious choice that caused a constitutional injury." *Vives v. City of New York*, 524 F.3d 346, 351 (2d Cir. 2008). "Freedom to act is inherent in the concept of 'choice.'" *Id.* at 353. Thus, when state law mandates particular conduct, "a municipality's decision to honor this obligation is not a conscious *choice*," and the municipality cannot incur *Monell* liability for merely carrying out that command. *Id.* "On the other hand, if a municipality decides to enforce a statute that it is authorized, but not required, to enforce, it may have created a municipal policy." *Id.* The inquiry ultimately concerns the degree of autonomy the municipality possessed over the conduct alleged to have caused the constitutional injury. *See Juzumas v. Nassau Cnty.*, 33 F.4th 681, 688 (2d Cir. 2022) ("[O]ur opinion in *Vives* establishes the framework for assessing asserted constitutional violations arising from municipal enforcement of state law. There, we set out a two-part test that looks generally to the amount of autonomy enjoyed by the municipality in effectuating the policy in question." (citation omitted)). "Where a [municipality] both (1) had a 'meaningful choice' as to whether it should enforce state law and (2) demonstrated a 'conscious choice' in adopting a policy to enforce such a law, it may be found liable for administering a state law." *Cavaluzzi v. Cnty. of Sullivan*, 825 F. Supp. 3d 279, 292 (S.D.N.Y. 2026) (quoting *Vives*, 524 F.3d at 353).

*Juzumas v. Nassau County* illustrates the distinction recognized by *Vives*. In *Juzumas*, the defendant county required a pistol-license holder to surrender his "long guns" (e.g., "long-barrel rifles and shotguns") after revocation of his license. 33 F.4th at 684-85. Because state law

directed that "any and all firearms, rifles, or shotguns" "shall be surrendered," the Second Circuit held that the County was "reasonably applying state law" and that the plaintiff's dispute with the mandatory surrender requirement "rest[ed] with the state law, whose constitutionality he ha[d] not challenged." *Id.* at 687-89 (citation omitted). But the court reached a different conclusion with respect to the County's alleged policy barring the plaintiff from possessing long guns until his pistol license was reinstated. *See id.* at 689, 692. State law imposed no such condition. *See id.* at 689. The Second Circuit therefore concluded that, if the County's policy had that effect, then "the policy goes beyond what state law requires," and it vacated and remanded that aspect of the plaintiff's *Monell* claims. *Id.* at 689, 692. Thus, the plaintiff's failure to challenge the state statute did not insulate municipal conduct that the statute itself did not require.

Other decisions in this Circuit apply the same principle. In *Dudek v. Nassau County Sheriff's Department*, the court likewise declined to apply a categorical bar to *Monell* liability where state law authorized confiscation of firearms but did not require the sheriff's department to refuse their return after the confiscation order had been vacated. 991 F. Supp. 2d at 411-13. Because the challenged no-return rule was not dictated by state law, the court held that defendants could not rely on *Vives* to defeat the *Monell* claim. *Id.* at 411-12. Conversely, where state law and a court order left municipal officials with no discretion to take the action that the plaintiff sought, courts have applied *Vives* to shield the municipality from *Monell* liability. *See Vaher v. Town of Orangetown*, 133 F. Supp. 3d 574, 606-07 (S.D.N.Y. 2015); *id.* at 607 ("There is, in sum, no evidence that [the police department] made a 'meaningful' or 'conscious' choice . . . . To the contrary, the decision was *made for* [the department] through application of clear state law and obedience to an active court order.").

Most recently, *Cavaluzzi v. County of Sullivan* applied the same distinction to a Takings Clause claim arising from a county's implementation of New York's tax-foreclosure law. 825 F.

Supp. 3d 279 (S.D.N.Y. 2026). There, the plaintiffs' claims arose from the county's retention of excess proceeds from its tax-foreclosure sales of taxpayers' properties. *See id.* at 284. The county argued that its retention of foreclosure surpluses was the product of state law, rather than any municipal policy. *Id.* at 293. The court rejected that argument because state law "did not *require* a county to retain the foreclosure surplus"; "[i]t merely authorized it to do so." *Id.* The county's elective policy therefore remained attributable to the county under Section 1983. *Id.* at 295-96.

These cases focus the inquiry on what state law actually compelled. Applied here, Section 1224 undoubtedly supplies important substantive rules. As discussed above, Section 1224(2) provided that ownership of a qualifying vehicle "shall immediately vest" in the local authority if certain preconditions were met, and Section 1224(3) exempted such vehicles from the ownership-inquiry and notice requirements that New York imposed for other abandoned vehicles. *See* VTL § 1224(2)-(3). But that latter subsection merely relieved the City of a state-law notice obligation; it did not direct the City to afford no additional process. *See* Def. RSUF ¶¶ 82-83 (describing the DVO Policy's lack of notice and hearing). Nor did Section 1224 prescribe the particular procedures through which DSNY would determine that a vehicle satisfied Section 1224(2)'s preconditions, classify the vehicle as a "pass" or "hold," make its determination final, or transfer the vehicle for dismantling and disposal. Those procedures instead arose from the DVO Policy. *See supra* Background Section I.B.

The City's Revised Rule reinforces the distinction. DSNY continues to administer Section 1224(2), but its present procedures require notice to ascertainable owners and interested parties, an opportunity for those parties to redeem the vehicle, and a hearing to challenge removal before final disposition. *See* Pls. RSUF ¶¶ 134-40. The Revised Rule thus illustrates

that implementation of Section 1224 does not inherently require the no-notice, no-hearing procedure embodied in the DVO Policy at issue here.

The City is therefore incorrect that Plaintiffs' failure to challenge Section 1224 itself categorically forecloses *Monell* liability. To the extent a particular asserted constitutional injury resulted solely from conduct that Section 1224 compelled, *Vives* may preclude attributing that injury to the City. *See Vives*, 524 F.3d at 353. But where the asserted injury instead resulted from a procedural or substantive choice embodied in the DVO Policy, the existence of Section 1224 does not itself defeat municipal liability. *See id.* The Court addresses that causation question as necessary in considering each of Plaintiffs' constitutional claims below.

**B. Plaintiffs' Claims Regarding the Cruz Vehicle Are Time-Barred**

The City's final threshold argument is that Plaintiffs' claims regarding the Cruz Vehicle are barred by the applicable limitations period. *See* Def. Br. at 22-23; Def. Reply at 9. The Court agrees.

*1. Legal Framework*

Section 1983 claims arising in New York are subject to a three-year statute of limitations. *See Owens v. Okure*, 488 U.S. 235, 251 (1989) (holding that New York's general three-year personal-injury limitations period governs Section 1983 claims); *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (applying the three-year limitations period to a Section 1983 action). A claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002) (quotation marks and citation omitted).

Relevant here, New York's COVID-19 executive orders tolled all limitations periods for 228 days between March 20 and November 3, 2020. *Bugliotti v. Republic of Arg.*, 169 F.4th 344, 354 (2d Cir. 2026) ("New York's COVID-era executive orders tolled the statute of

limitations between March 20 and November 3, 2020, for a total of 228 days."). Plaintiffs additionally invoke two federal tolling doctrines: (1) equitable tolling and (2) the continuing violation doctrine. Pls. Reply at 26-27.

The doctrine of federal equitable tolling "is exceedingly narrow," *Patraker v. Council on Env't of N.Y.C.*, No. 02-cv-07382 (LAK), 2003 WL 22703522, at *2 (S.D.N.Y. Nov. 17, 2003), and is "to be applied sparingly," *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). It permits a court, "under compelling circumstances, [to] make narrow exceptions to the statute of limitations in order 'to prevent inequity.'" *In re U.S. Lines, Inc.*, 318 F.3d 432, 436 (2d Cir. 2003) (quoting *Chao v. Russell P. Le Frois Builder, Inc.*, 291 F.3d 219, 223 (2d Cir. 2002)). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Those elements are "distinct," and the absence of either forecloses equitable tolling. *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 256 (2016). Equitable tolling may apply when: "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 801 (2d Cir. 2014) (citation omitted). "In a nutshell, equitable tolling is invoked in cases where the plaintiff is ignorant of his cause of action because of the defendant's fraudulent concealment[.]" *Mehrotra v. U.S. Dep't of Lab.*, 186 F.4th 120, 128 (2d Cir. 2026) (quotation marks and citation omitted). "In that situation, the statute of limitations 'does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of

action.'" *Facciolo v. City of New York*, No. 09-cv-01332 (DGT) (JMA), 2010 WL 3155251, at *7 (E.D.N.Y. Aug. 6, 2010) (quoting *Keating v. Carey*, 706 F.2d 377, 382 (2d Cir. 1983)).

The continuing violation doctrine, by contrast, "has usually — but not exclusively — been applied in the context of Title VII discrimination claims." *Remigio v. Kelly*, No. 04-cv-01877 (JGK) (MHD), 2005 WL 1950138, at *6 (S.D.N.Y. Aug. 12, 2005), *abrogated on other grounds by K.W. ex rel. K.A. v. City of New York*, 177 F.4th 127 (2d Cir. 2026). "The Second Circuit has generally reasoned by analogy to Title VII cases when applying the continuing violation doctrine to circumstances other than employment discrimination cases." *Matagrano v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 19-cv-00763, 2021 WL 2036696, at *3 (N.D.N.Y. May 21, 2021). "Under th[e] doctrine, if a plaintiff has experienced a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (omission adopted) (quotation marks and citation omitted). "Importantly, the continuing violation doctrine does not apply to discrete unlawful acts, even if the discrete acts were undertaken 'pursuant to a general policy that results in other discrete acts occurring within the limitations period.'" *Rivas v. New York State Lottery*, 745 F. App'x 192, 193 (2d Cir. 2018) (summary order) (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012)); *accord Sylla v. N.Y.C. Dep't of Educ.*, 664 F. Supp. 3d 311, 329 (E.D.N.Y. 2023); *Matagrano*, 2021 WL 2036696, at *3. In such cases, "each discrete . . . act starts a new clock for filing charges alleging that act." *Taylor v. City of New York*, 207 F. Supp. 3d 293, 301 (S.D.N.Y. 2016) (alteration adopted) (quoting *Morgan*, 536 U.S. at 113). "Applying [the continuing violation] doctrine is heavily disfavored in the Second Circuit, and courts have been loath to apply it absent a showing of compelling circumstances." *Reyes v. Westchester Cnty. Health Care Corp.*, No. 19-cv-08916 (PMH), 2021 WL 310945, at *8 (S.D.N.Y. Jan. 29,

2021) (quotation marks and citation omitted), *aff'd*, No. 21-0410, 2021 WL 4944285 (2d Cir. Oct. 25, 2021) (summary order).

*2. Application*

The Cruz Vehicle was removed on November 25, 2019. Pls. RSUF ¶ 74. In its opening brief, the City contends that the relevant constitutional claims accrued no later than that date because Section 1224 immediately vested ownership in the City. *See* Def. Br. at 23. Plaintiffs respond that they were not notified of the City's actions and invoke both equitable tolling and the continuing violation doctrine. Pls. Reply at 26-27. They also correctly observe that the 228-day COVID-19 tolling period applies. *Id.* at 26.

In its reply brief, the City submits evidence that Plaintiffs were aware of the Cruz Vehicle's disposition as early as January 24, 2020. *See* Def. Reply at 9 (citing Cullen Reply Decl., Ex. A ¶ 3); Cullen Reply Decl., Ex. A ¶ 3 (Plaintiffs' responses and objections to the City's interrogatory seeking identification of "all communications and communication attempts between Plaintiffs and the City concerning the Vehicles," identifying a "January 24, 2020 . . . [c]all to [the] Department of Sanitation regarding seizure of" the "Cruz Vehicle"). Plaintiffs conceded this fact at oral argument. Tr. at 40:14-41:1. Even using that later date as the accrual date, Plaintiffs' claims are untimely. Three years plus the 228-day COVID-19 tolling period would place the close of the limitation period in September 2023. Plaintiffs commenced this action on February 16, 2024. *See* Compl.

Neither of Plaintiffs' additional tolling theories changes that result. Whatever concealment may have occurred before January 24, 2020, Plaintiffs had actual knowledge by that date that the City had disposed of the Cruz Vehicle. Equitable tolling does not extend the limitations period after a plaintiff knows the facts giving rise to the asserted injury. *See Pearl*, 296 F.3d at 85 (rejecting tolling where the plaintiff knew the operative acts underlying his

claim). The continuing violation doctrine is also inapplicable. It is true that the DVO Policy remained in force and that the City later applied it to other vehicles in which Plaintiffs held interests. *See* Pls. RSUF ¶¶ 36, 45, 55, 65, 83, 92, 100, 109, 118. But the disposition of the Cruz Vehicle was a deprivation affecting a particular item of property. Subsequent applications of the DVO Policy to the other Vehicles therefore caused separate injuries and did not restart the limitations period for the Cruz Vehicle. *See, e.g.*, *Gonzalez v. Hasty*, 802 F.3d 212, 223 (2d Cir. 2015) ("[A] discrete claim may accrue under the Fifth Amendment each time that a defendant fails to provide [a plaintiff] with the notice, hearing, or evaluation to which he is entitled after a liberty interest attaches."); *Birch v. City of New York*, 184 F. Supp. 3d 21, 27 (E.D.N.Y. 2016) (declining to apply continuing violation doctrine where the "plaintiff concede[d] that he was subjected to discrete retaliatory actions, any one of which could have been the subject of suit at the time each occurred"), *aff'd*, 675 F. App'x 43 (2d Cir. 2017) (summary order); *Young v. Strack*, No. 05-cv-09764 (WHP), 2007 WL 1575256, at *5 (S.D.N.Y. May 29, 2007) (declining to apply doctrine to "First, Eighth and Fourteenth Amendment claims" because the plaintiff's "allegations describe[d] distinct incidents involving different periods, circumstances and locations" (alterations adopted) (quotation marks and citation omitted)). Simply put, the continuing violation doctrine does not apply to claims, such as Plaintiffs', "that challenge discrete acts of unconstitutional conduct." *Shomo v. City of New York*, 579 F.3d 176, 182 (2d Cir. 2009).

Because neither tolling doctrine can revive Plaintiffs' claims, summary judgment is granted for the City as to all claims based on the Cruz Vehicle. The remainder of the Court's merits analysis therefore concerns only the other nine Vehicles.

## II. Fourteenth Amendment Procedural Due Process Claim (Count II)

The parties first dispute whether the City deprived Plaintiffs of property without due process. Plaintiffs argue that their ownership and lien interests in the Vehicles were protected property interests, and that the City violated the Fourteenth Amendment when it treated those interests as extinguished and disposed of the Vehicles without providing Plaintiffs any notice or opportunity to be heard. *See* Pls. Br. at 7-16; Pls. Reply at 13-15. The City responds that, if the Vehicles satisfied Section 1224(2)'s criteria, including the applicable wholesale-value threshold, then ownership immediately vested in the City by operation of state law, and no protected interest remained for which process was due. *See* Def. Br. at 15-16, 20-22; Def. Reply at 1-4. The City therefore contends that disputed questions concerning the Vehicles' values preclude summary judgment. *See* Def. Br. at 17-20.

The City's response puts the cart before the horse. Plaintiffs held protected property interests in the Vehicles before the City invoked Section 1224(2), and it is undisputed that the DVO Policy provided no process through which Plaintiffs could contest the factual determinations that the City treated as grounds to terminate those interests. For the following reasons, the Court grants Plaintiffs summary judgment on their Fourteenth Amendment claim as to the nine remaining Vehicles.

### A. Legal Framework

The Fourteenth Amendment prohibits a State from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Due process generally requires "notice and an opportunity to be heard before the Government deprives [one] of property." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993) (collecting cases); *see Connecticut v. Doehr*, 501 U.S. 1, 12 (1991) ("[E]ven the temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are

sufficient to merit due process protection."). Notice must "be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Livant v. Clifton*, 272 F. App'x 113, 116 (2d Cir. 2008) (summary order) (quoting *Mullane v. C. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)); *see Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800 (1983) (holding that when an interested party's "name and address are reasonably ascertainable," "[n]otice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding [that] will adversely affect the . . . property interest of *any* party"). As for the opportunity to be heard, "[d]ue process does not . . . require a hearing before the state interferes with a protected interest, so long as some form of hearing is provided before an individual is finally deprived of the property interest." *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011) (citation modified). Ultimately, however, "[d]ue process . . . is a flexible concept that varies with the particular situation," *Zinermon v. Burch*, 494 U.S. 113, 127 (1990), and "where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause," *Gilbert v. Homar*, 520 U.S. 924, 930 (1997).

"In adjudicating due process claims, '[courts] consider two distinct issues: 1) whether plaintiffs possess a liberty or property interest protected by the Due Process Clause; and, if so, 2) whether existing state procedures are constitutionally adequate.'" *Ford Motor Credit Co. v. N.Y.C. Police Dep't*, 503 F.3d 186, 190 (2d Cir. 2007) (quoting *Kapps v. Wing*, 404 F.3d 105, 112 (2d Cir. 2005)). What process is constitutionally adequate, in turn, depends on the familiar *Mathews v. Eldridge* factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation" under the procedures used "and the probable

value . . . of additional . . . procedural safeguards"; and (3) the government's interest and the burdens that additional procedures would impose. 424 U.S. 319, 335 (1976).

With that framework in mind, the Court first considers whether Plaintiffs possessed protected property interests and, if so, whether the procedures that the City used to deprive them of those interests satisfied due process.

**B. Plaintiffs Possessed Protected Property Interests**

There is no dispute that, for purposes of the Fourteenth Amendment, Plaintiffs possessed protected interests in the Vehicles before DSNY acted — though those interests differed in form.

The City admits that AHFC held perfected liens on the Khan, Smith, Vasquez, and Griffin Vehicles before their removal. *See* Def. RSUF ¶¶ 20, 28, 36, 44. The Second Circuit has held that "a security interest is indisputably a property interest protected by the Fourteenth Amendment," because a secured creditor possesses both "the *contractual* right to repayment of the debt owed and the *property* right to the collateral that secures the debt in the event of non-payment." *Ford*, 503 F.3d at 191. That interest extends to "the collateral itself — the seized vehicle" and its present value. *Id.* at 191.

The City likewise admits that HVT held title to the Beatty, Rodriguez, Salgado, and Jones Vehicles, and that HLT held title to the Philbert Vehicle before the City's intervention. *See* Def. RSUF ¶¶ 51, 58, 65, 72, 79. Those ownership interests are paradigmatic property interests protected by due process. *See, e.g.*, *Ferrari v. Cnty. of Suffolk*, 845 F.3d 46, 56 (2d Cir. 2016), *as amended* (Jan. 4, 2017) (observing that vehicle "forfeiture law violated the Due Process Clause of the Fourteenth Amendment because it did not afford . . . title owners, a prompt, post-seizure opportunity to test the probable validity of the retention of their vehicles"); *see also Propert v. D.C.*, 948 F.2d 1327, 1331 (D.C. Cir. 1991) ("Whether a junk car has little or great value, it is constitutionally protected property." (citation omitted)).

### C. The City Did Not Afford Plaintiffs Constitutionally Adequate Process Before Depriving Them of Their Property Rights

Having established that Plaintiffs possessed property interests protected by the Fourteenth Amendment, the question becomes what process the City was required to provide before those interests could be extinguished. The City asserts that the answer lies in Section 1224. In particular, because Section 1224(3) exempts Section 1224(2) vehicles from the notice procedures prescribed for other abandoned vehicles, *see* VTL § 1224(3), the City contends that, once Section 1224(2)'s prerequisites were met, title passed to the City by operation of law, and the City was required to do nothing further before disposing of the Vehicles. *See* Def. Br. at 20-22; *see also* Def. Reply at 2-4. That argument elides two important distinctions.

First, Section 1224(3) does not require the City to withhold notice or an opportunity to be heard; it merely exempts Section 1224(2) vehicles from the particular notice procedure that state law otherwise prescribes. *See* VTL § 1224(3). Section 1224's resultant silence on notice for Section 1224(2) vehicles does not displace the requirements of federal due process. *See McCreery v. Babylon Union Free Sch. Dist.*, 827 F. Supp. 136, 138 n.3 (E.D.N.Y. 1993) ("Once state law confers a property interest, it is the federal Constitution that defines the procedure for its deprivation."); *Loudermill*, 470 U.S. at 541 (observing that once a property interest falls within the Due Process Clause's protection, "the question remains what process is due," and "[t]he answer to that question is not to be found in the [state] statute" (citation omitted)).

Second, and more fundamentally, Section 1224(2)'s consequences followed only if its factual predicates were met. The City therefore first had to determine, among other factors, that a particular Vehicle fell below the statutory wholesale-value threshold of $1,250. *See* VTL § 1224(2). The constitutional issue, then, is whether the City could conclusively determine that Section 1224(2) applied — and thereby proceed to permanently dispose of property in which

Plaintiffs held protected interests — without providing interest holders notice of the impending deprivation or a meaningful opportunity to contest the predicates on which it depended. The Court considers those two requirements in turn and concludes that the City could not do so.

*1. The DVO Policy Did Not Provide Constitutionally Adequate Notice*

The DVO Policy did not require DSNY to identify lienholders or lessors through VINs and did not provide individualized notice to them. *See* Def. RSUF ¶ 83. The City does not dispute that feature of the DVO Policy. It instead points to the tag placed on the Vehicles and to Section 1224(3)'s exemption of Section 1224(2) vehicles from New York's statutory notice procedure. *See id.*; *see also* Pls. RSUF ¶¶ 17-18; Def. RSUF ¶ 85(B); Scully Dep. at 38:2-13, 39:4-8; DVO Policy at CNY0068-69. Neither answers the federal constitutional question.

First, notice affixed to the physical Vehicles was not "reasonably calculated" to reach Plaintiffs. *Livant*, 272 F. App'x at 116 (citation omitted). AHFC, HVT, and HLT held nonpossessory interests, recorded independently of the persons who left the Vehicles on the street. Plaintiffs therefore could not reasonably have known where the Vehicles were located, much less seen a notice posted during the forty-eight hours or less before towing. *See* Scully Dep. at 39:6-24, 42:12-16. More importantly, the City offers no evidence that Plaintiffs' identities were not "reasonably ascertainable." *Mennonite Bd. of Missions*, 462 U.S. at 800. To the contrary, the record establishes the existence of recorded liens and titles, *see* Pls. Br. at 8 ("[T]he name, address and interest of either HVT or AHFC was recorded on the title to the Vehicles." (citing Pls. SUF ¶¶ 12, 20, 28, 36, 44, 51, 58, 65, 72, 79)); *see also id.* at 10 ("Plaintiffs' name, address and respective interests in the Vehicles were easily ascertainable from public records."), and the City's Revised Rule evinces that direct notice to interested parties like Plaintiffs was possible, *see* Pls. RSUF ¶ 135; Revised Rule at 4-5. The facts here are therefore akin to those in *Mennonite Board of Missions*, wherein the Supreme Court concluded that

constructive notice could not substitute for direct notice where government action threatened an identifiable mortgagee's recorded property interest. *See* 462 U.S. at 798-800. The City's method of notice was likewise constitutionally deficient. *See Mullane*, 339 U.S. at 315 ("[W]hen notice is a person's due, process which is a mere gesture is not due process. . . . The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected[.]").

Second, Section 1224(3)'s exemption of Section 1224(2) vehicles from the statute's notice requirement is immaterial. As discussed, Section 1224(3) merely informed local authorities when New York law required the statutory notice procedure; it did not set the federal constitutional floor. The Due Process Clause independently governs the procedures necessary before the government may deprive an ascertainable interest holder of its protected property rights, and the City failed to provide the notice that the Due Process Clause requires. *See Propert*, 948 F.2d at 1335 ("[E]ven if D.C. may *tow* a vehicle that is seen to be 'junk' pursuant to the sticker notice without offending due process, D.C. may not thereafter act to *destroy* the car without affording the owner post-towing notice and an opportunity to be heard."); *Am. Honda Fin. Corp. v. City of Revere*, 471 F. Supp. 3d 399, 408-09 (D. Mass. 2020) ("[The city]'s policy, worse than providing insufficient notice, provides no notice at all, thereby wholly depriving Honda of the ability or opportunity to protect its property interest."). Accordingly, the DVO Policy failed to provide adequate notice.

*2. The DVO Policy Did Not Provide an Opportunity to Be Heard*

The hearing defect is clearer still. The City admits that it "did not and does not arrange a hearing in relation to the actions it took with respect to any of the Vehicles." Def. RSUF ¶ 82. Under the DVO Policy, a person who happened to locate a vehicle at the tow yard could attempt to claim it by presenting proof of ownership and arranging for lawful removal, Pls. RSUF ¶ 23,

but the DVO Policy afforded no procedure through which Plaintiffs could contest DSNY's classification, the $1,250 wholesale value predicate, or the impending transfer and destruction of their interests before a final disposition.

That complete absence of review cannot be reconciled with *Mathews*. *See* 424 U.S. at 333 ("[S]ome form of hearing is required before an individual is finally deprived of a property interest."). Indeed, several courts in this Circuit have reached the same conclusion in vehicle seizure cases. *See, e.g.*, *TD Auto Fin. LLC v. Cnty. of Putnam*, No. 21-cv-09080 (AEK), 2023 WL 6295116, at *9 (S.D.N.Y. Sept. 27, 2023) ("The law is clear that some form of hearing is required — either pre- or post-seizure — before an individual or entity is finally deprived of a property interest, and that the absence of any hearing whatsoever necessarily will fail the *Mathews* balancing test."); *HVT, Inc. v. Port Auth. of N.Y. & N.J.*, No. 15-cv-05867 (MKB) (VMS), 2018 WL 3134414, at *9 (E.D.N.Y. Feb. 15, 2018) ("[T]he Court need not examine this case under the *Mathews* factors as the question presented is . . . whether [d]efendant can summarily deprive [p]laintiff of its property without any opportunity for a hearing. The law is quite clear that it cannot."), *report and recommendation adopted*, 2018 WL 1409821 (E.D.N.Y. Mar. 21, 2018); *Mercedes-Benz Fin. Servs. USA, LLC v. City of New York*, 770 F. Supp. 3d 643, 658 (S.D.N.Y. 2025) ("Plaintiff argues that by failing to provide lienholders with the opportunity for any hearing at any time, [New York City's vehicle seizure] program is per se unconstitutional such that there is no need to apply the *Mathews* balancing test. I agree." (citation omitted)); *Santander Consumer USA, Inc. v. City of Yonkers*, No. 22-cv-08870 (KMK), 2024 WL 4817649, at *11 (S.D.N.Y. Nov. 18, 2024) ("[T]he Court finds that Yonkers did not provide Santander with due process of the law as required by the Fourteenth Amendment. Yonkers' policy is deficient for failing to timely notice Santander and to provide an opportunity to be heard at all."). Though the precise substantive rules in those cases differed, the constitutional point is the same:

the government cannot finally extinguish a recorded property interest without an opportunity for the individual or entity with property rights to be heard.

The *Mathews* factors independently confirm this result. First, Plaintiffs' private interests are substantial. The Second Circuit in *Ford* described a lienholder's "interest in the present value of a seized vehicle" as "considerable," even though it is less weighty than an owner's interest in a vehicle used for transportation or livelihood. 503 F.3d at 194; *accord City of Yonkers*, 2024 WL 4817649, at *11; *TD Auto*, 2023 WL 6295116, at *11; *Mercedes-Benz*, 770 F. Supp. 3d at 659. HVT and HLT held title to their Vehicles, and AHFC held perfected security interests in its Vehicles.

Second, the DVO Policy presented a meaningful risk of erroneous deprivation. Section 1224(2) turned on wholesale value, *see* VTL § 1224(2), yet DSNY officers deliberately did not assign a dollar value to the vehicles they inspected, *see* DVO Policy at CNY0066 ("The Department of Sanitation (DSNY) will not place a dollar value on a derelict vehicle."). Instead, DSNY personnel applied criteria based on a given vehicle's condition to determine whether the statutory predicates were satisfied, and, once a supervisor designated a vehicle a "pass," the City transferred title to its contractor and authorized dismantling. *See* Def. RSUF ¶ 85(A), (E)-(H). The parties' present valuation dispute illustrates the value of a hearing in such circumstances: Plaintiffs contend that eight Vehicles exceeded the statutory ceiling, while the City contends that Plaintiffs used the wrong valuation measure. *See id.* ¶¶ 91-92, 94. A hearing would have allowed Plaintiffs to present title or lien documents, valuation evidence, and other grounds for contesting final disposition before the City extinguished their property rights.

Third, while the City's interest in "promot[ing] public safety by removing . . . safety and health hazards and . . . improv[ing] traffic patterns by removing encumbrances," Pls. RSUF ¶ 9, absolutely justifies prompt removal of purportedly derelict vehicles from public streets, it does

not justify eliminating all process before permanent disposition of those vehicles. *See Propert*, 948 F.2d at 1335 ("[E]ven if D.C. may *tow* a vehicle that is seen to be 'junk' pursuant to the sticker notice without offending due process, D.C. may not thereafter act to *destroy* the car without affording the owner post-towing notice and an opportunity to be heard."). The parties agree that the DVO Policy serves legitimate health, safety, and traffic-management objectives. *See* Pls. RSUF ¶ 9 ("The DVO policy promotes public safety by removing dangerous vehicles from the streets of New York that are safety and health hazards and[] leads to improved traffic patterns by removing encumbrances in streets and intersections."). Indeed, Plaintiffs expressly state that they "do[] not dispute that the removal of the Vehicles from the street was reasonable," Pls. Reply at 19 (emphasis omitted), and their opening brief contemplates participation "after a tow but before a final decision that pre-existing property rights have been abandoned," Pls. Br. at 16. Thus, the constitutional deficiency identified here arose after removal, when the immediate street-safety concern had abated. At that point, the City converted temporary custody into an irreversible loss of title or collateral value. While providing notice and a prompt opportunity to challenge final disposition would unquestionably impose some administrative burden, the City identifies no burden sufficient to reduce the constitutionally required process to zero. *See TD Auto*, 2023 WL 6295116, at *9 ("The amount of process required can never be reduced to zero — that is, the government is never relieved of its duty to provide *some* opportunity to be heard prior to final deprivation of a property interest." (alteration and omission adopted) (citation omitted)). Yet, the record before the Court reflects a complete absence of constitutionally adequate procedure.

* * *

Both constitutional deprivations identified above are attributable to municipal policy. The absence of individualized notice and any procedure for contesting DSNY's determination

before final disposition were features of the DVO Policy, not requirements imposed by Section 1224. Because the DVO Policy itself supplied the procedures that the Court concludes were constitutionally inadequate, the DVO Policy was the "moving force" behind the procedural due process violation, *Monell*, 436 U.S. at 694, and the City is accordingly not exempt from *Monell* liability, *see Vives*, 524 F.3d at 353.

In sum, the City could address an apparent street hazard first and provide process afterward. What it could not do was use its own unreviewed and untested procedure to establish the facts that it treated as extinguishing recorded title and lien interests, and then permanently dispose of the collateral before notifying the interest holders or affording them any meaningful opportunity to object. The Court therefore grants Plaintiffs summary judgment on their Fourteenth Amendment procedural due process claim as to the nine remaining Vehicles.

**III. Fourth Amendment Warrantless Seizure Claim (Count I)**

The parties next dispute whether the City's post-removal disposal of the Vehicles violated the Fourth Amendment. Plaintiffs expressly "do[] not dispute that the removal of the Vehicles from the street was reasonable." Pls. Reply at 19 (emphasis omitted). They instead argue that the seizure became unreasonable when the City later asserted ownership, transferred the Vehicles to its contractors, and caused them to be dismantled, thereby converting a temporary interference into a permanent one. *Id.* at 19-21. The City responds that post-seizure retention and disposition of property lawfully seized at the outset do not create an independent Fourth Amendment claim in this Circuit. Def. Br. at 6-11; Def. Reply at 4-6. The Court agrees with the City. Even assuming each Plaintiff possessed a cognizable Fourth Amendment interest in the relevant Vehicle, *Shaul v. Cherry Valley-Springfield Central School District*, 363 F.3d 177 (2d Cir. 2004) forecloses the separate post-seizure theory Plaintiffs advance. Accordingly, the Court

grants the City summary judgment on this claim as to the nine remaining Vehicles and denies Plaintiffs' corresponding request.

### A. Legal Framework

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "By virtue of its incorporation through the Fourteenth Amendment's Due Process Clause, the Fourth Amendment is binding on states and, relevant here, municipalities such as New York City." *Tsinberg v. City of New York*, No. 20-cv-00749 (PAE), 2021 WL 1146942, at *10 (S.D.N.Y. Mar. 25, 2021).

"A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *accord Santander Consumer USA, Inc. v. Port Auth. of N.Y. & N.J.*, Nos. 20-cv-01997 (MKB) & 20-cv-01998 (MKB), 2022 WL 3099239, at *5 (E.D.N.Y. Aug. 4, 2022).[7] "Warrantless searches and seizures are 'per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" *United States v. Weaver*, 9 F.4th 129, 138 (2d Cir. 2021) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

[7] Courts in this Circuit have cast doubt on whether a lienholder such as AHFC can be said to have a present possessory interest in the vehicles on which it has a lien. *See, e.g.*, *Santander Consumer USA, Inc. v. Cnty. of Suffolk*, No. 20-cv-02656 (JS) (AKT), 2021 WL 4480574, at *6 (E.D.N.Y. Sept. 30, 2021) ("'[I]t must be emphasized that unlike' titled vehicle owners, [p]laintiff, as 'the innocent lienholder, does not have a present possessory right' to the seized vehicles." (emphasis omitted) (quoting *Prop. Clerk v. Leon*, 28 Misc.3d 1233(A), 2010 WL 3529512, at *4 (N.Y. Sup. Ct. 2010))); *Santander Consumer USA, Inc. v. Cnty. of Nassau*, 623 F. Supp. 3d 6, 16 (E.D.N.Y. 2022) ("The parties do not cite any case law addressing the extent to which a lienholder whose present possessory interest results from default has a Fourth Amendment right."). The Court need not resolve that unsettled issue. As discussed below, Plaintiffs' Fourth Amendment claim fails even assuming that AHFC, HVT, and HLT all had cognizable possessory interests in the Vehicles for Fourth Amendment purposes.

One such exception is the community caretaking exception. "'Under th[e] community caretaking exception to the warrant requirement, police officers may exercise their discretion in deciding whether to impound a vehicle,' and 'whether a decision to impound is reasonable under the Fourth Amendment is based on all the facts and circumstances of a given case.'" *VW Credit Leasing LTD. v. Runway Towing Corp.*, 757 F. Supp. 3d 271, 285 (E.D.N.Y. 2024) (alteration adopted) (quoting *United States v. Lyle*, 919 F.3d 716, 728, 731 (2d Cir. 2019)); *see South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."); *Vasquez v. Yadali*, No. 16-cv-00895 (NSR), 2020 WL 1082786, at *7 (S.D.N.Y. Mar. 5, 2020) ("[I]t is reasonable for police officers to impound the vehicle under community care functions where, among other things, the vehicle would otherwise threaten public safety[.]") (alterations and omissions adopted) (quoting *United States v. Colon*, No. 10-cr-00498 (RPP), 2011 WL 569874, at *14 (S.D.N.Y. Feb. 8, 2011))); *United States v. Morris*, No. 20-cr-00100, 2022 WL 1651408, at *4 (W.D.N.Y. Apr. 12, 2022) ("It is well established that police have the authority, despite the absence of a warrant, to seize and remove from the streets automobiles in the interests of public safety and as part of their community caretaking functions — an authority that is beyond reasonable challenge." (quoting *Lyle*, 919 F.3d at 728)), *report and recommendation adopted*, 2022 WL 1645261 (W.D.N.Y. May 24, 2022).

### B. *Shaul* Forecloses Plaintiffs' Fourth Amendment Claim

Plaintiffs' concession concerning the initial tow narrows the Fourth Amendment inquiry considerably. *See* Pls. Reply at 19 ("Honda does not dispute that the *removal* of the Vehicles from the street was reasonable."). Presumably because of the community caretaking exception, Plaintiffs' theory of Fourth Amendment injury is premised on what the City did *after* it reasonably removed the Vehicles from the street: transferring title to itself and then to its

contractor and thereafter permanently destroying the Vehicles and all associated property interests therein. *Id.* at 19-21. Those acts may implicate other constitutional protections, *see, e.g.*, *supra* Sections II.B-C, but they do not amount to a standalone violation of the Fourth Amendment.

Second Circuit precedent imposes an important limit where property was lawfully seized at the outset. In *Shaul v. Cherry Valley-Springfield Central School District*, school officials removed property remaining in the plaintiff-teacher's classroom after his suspension, and although they later returned boxes of his personal effects, certain teaching materials were "never returned to him and presumably discarded." 363 F.3d at 185; *see also id.* at 184-85. The Second Circuit nevertheless affirmed the district court's grant of summary judgment to defendants on plaintiff's Fourth Amendment claim, holding that he "[w]here . . . an initial seizure of property was reasonable, defendants' failure to return the items does not, by itself, state a separate Fourth Amendment claim of unreasonable seizure." *Id.* at 187. Rather, any constitutional protection concerning the defendants' post-seizure failure to return the property "would appear to [sound in] procedural due process." *Id.* The Second Circuit has subsequently reiterated that "'a seizure claim based solely on the unlawful retention' of property that was lawfully seized" presents "too novel a theory to warrant Fourth Amendment protection" and is better analyzed under the framework of "procedural due process." *Bennett v. Dutchess Cnty.*, 832 F. App'x 58, 60 (2d Cir. 2020) (summary order) (alteration adopted) (citation omitted); *accord Bello v. Rockland Cnty.*, 846 F. App'x 77, 79 (2d Cir. 2021) (summary order).

*United States v. Jacobsen*, a case decided twenty years before *Shaul* and cited by Plaintiffs, *see* Pls. Br. at 20, does not compel a different result. There, federal agents lawfully took possession of a package containing unidentified white powder and performed a chemical field test that destroyed a small quantity of that powder. 466 U.S. at 111-12, 121-22. The

Supreme Court separately analyzed the removal of the powder from the package and the chemical test of the same, *see id.* at 118, reasoning that "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures,'" *id.* at 124. It ultimately concluded that the destruction "was reasonable . . . since the property had already been lawfully detained," and thus "the 'seizure' could, at most, have only a *de minimis* impact on any protected property interest." *Id.* at 125.

There is, admittedly, some tension between the rules articulated in *Jacobsen* and *Shaul*. Indeed, at least one circuit court judge has recognized this tension and rejected the Second Circuit's approach. *See Asinor v. D.C.*, 111 F.4th 1249, 1261-62 (D.C. Cir. 2024) (Henderson, J., concurring) ("Five circuits — the First, Second, Sixth, Seventh and Eleventh — have held in precedential opinions that the Fourth Amendment does not support a claim for the government's retention of legally seized property. . . . Granted, we should hesitate before rejecting a robust consensus from our sister circuits but here, I believe, their reasoning lacks the power to persuade because they fail to discuss [*Jacobsen*]." (citations omitted)).

Nonetheless, *Shaul* controls the constitutional framework in this Circuit. "For a district court to ignore binding Second Circuit precedent, it is not enough for a Supreme Court decision to be in tension with that precedent." *King v. Habib Bank Ltd.*, No. 20-cv-04322 (LGS), 2023 WL 8355359, at *1 (S.D.N.Y. Dec. 1, 2023). This Court is bound by *Shaul* "unless and until that case is reconsidered by [the Second Circuit] sitting in banc (or its equivalent) or is rejected by a later Supreme Court decision." *Monsanto v. United States*, 348 F.3d 345, 351 (2d Cir. 2003). Neither the Supreme Court nor the Second Circuit has subsequently addressed this tension.

At oral argument, Plaintiffs reasoned that the Supreme Court's more recent opinion in *Manuel v. City of Joliet*, 580 U.S. 357 (2017) undermined *Shaul* by recognizing that a seizure

can remain governed by the Fourth Amendment after its lawful inception. *See* Tr. at 18:17-19:16. Plaintiffs' argument suffers from two defects. First, the Supreme Court did not purport to reject *Shaul* in deciding *Manuel*, so *Shaul* still remains the law of this Circuit. *See Monsanto*, 348 F.3d at 351. Second, the holding in *Manuel* was cabined to the continued pretrial detention of a *person* after legal process began. 580 U.S. at 366-67 ("[P]retrial detention can violate the Fourth Amendment not only when it precedes, but also when it follows, the start of legal process in a criminal case."); *id.* at 369-70 ("Our holding — that the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process — does not exhaust the disputed legal issues in this case."). That context matters. Long before *Manuel*, the Supreme Court distinguished the constitutional treatment of criminal detention of people from governmental control over property. In *United States v. James Daniel Good Real Property*, the Supreme Court explained that "the arrest or detention of criminal suspects [are] subjects [that the Supreme Court] ha[s] considered to be governed by the provisions of the Fourth Amendment without reference to other constitutional guarantees" like "the Due Process Clause" because "the [Fourth] Amendment was 'tailored explicitly for the criminal justice system.'" 510 U.S. at 50 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975)). By contrast, when the government seizes property "to assert ownership and control over the property itself," "the Fourth Amendment . . . does not provide the sole measure of constitutional protection," and "it remains for [the courts] to determine whether the seizure complied with . . . the Due Process Clause" as well. *Id.* at 52. Though *Good* does not hold that the Fourth Amendment becomes irrelevant after a lawful property seizure, it explains why *Manuel*'s rule for continued detention of persons does not silently displace *Shaul*'s rule for lawfully seized property and supports *Shaul*'s assessment that such property claims sound in due process.

More importantly, the Second Circuit has continued to apply *Shaul* after *Manuel*, albeit in nonprecedential summary orders. *See, e.g.*, *Bennett*, 832 F. App'x at 60; *Bello*, 846 F. App'x at 79. And district courts in this Circuit have done the same in vehicle seizure cases. *See, e.g.*, *Mercedes-Benz*, 770 F. Supp. 3d at 649, 664 (holding that a reasonable initial seizure did not support a separate Fourth Amendment claim based on later retention and auction of vehicle); *City of Yonkers*, 2024 WL 4817649, at *6-8, *12 (applying *Shaul* to post-seizure retention, title transfer, and sale); *Santander Consumer USA, Inc. v. Inc. Vill. of Hempstead*, No. 22-cv-04428 (EK) (ARL), 2026 WL 2719971, at *5 (E.D.N.Y. Sept. 15, 2026) (holding that "[b]ecause the [initial] seizure was reasonable, [the municipality]'s retention and subsequent transfer" of title to the vehicle could not "provide an independent basis for a Fourth Amendment violation"); *see also Bradley v. City of New York*, No. 04-cv-08411 (RWS) (MHD), 2007 WL 232945, at *4 (S.D.N.Y. Jan. 26, 2007) ("The Court is aware of no case . . . discussing a Fourth Amendment claim stemming from a fact pattern . . . in which personal property that has been seized pursuant to an arrest is destroyed at some later point in time. Because, in such a case, a seizure of the property has already occurred, the subsequent destruction of that property by the police is more properly addressed as a claim for the deprivation of property under the Due Process Clause of the Fourteenth Amendment.").

In sum, Plaintiffs' alleged injury arose from what the City did to Plaintiffs' property after an initial seizure that Plaintiffs concede was lawful. *See* Pls. Reply at 19. *Shaul* directs courts to analyze such post-seizure deprivations under procedural due process rather than recognize a separate Fourth Amendment claim. *See* 363 F.3d at 187. The Court has not been presented with any reason to depart from this binding precedent. Accordingly, the Court grants the City

summary judgment on Plaintiffs' Fourth Amendment claim as to the nine remaining Vehicles and denies Plaintiffs' cross-motion for the same.[8]

## IV. Fifth Amendment Takings Claim (Count III)

The parties' final federal claim concerns whether the City's treatment of the Vehicles effected a compensable taking of Plaintiffs' ownership and security interests for which Plaintiffs received no compensation, in contravention of the Fifth Amendment. *See* Pls. Br. at 16-20; Pls. Reply at 15-19; Def. RSUF ¶ 89. The City responds that qualifying Vehicles became City property by operation of Section 1224(2), that the challenged conduct was an exercise of the police power rather than a taking for public use, and that any mandatory consequence imposed by state law cannot support municipal liability under *Monell*. *See* Def. Br. at 12-15, 23-24; Def. Reply at 2-4, 6-8. Because the Takings Clause analysis differs depending on the property interest and governmental act at issue, the Court addresses this claim in separate parts.

### A. Legal Framework

The Fifth Amendment's Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. Like the Fourth Amendment's prohibition on unreasonable searches and seizures, the Fifth Amendment's Takings Clause "is applicable to the conduct of the states and their municipal subdivisions through the Fourteenth Amendment." *Coney Island Resorts, Inc. v. Giuliani*, 103 F. Supp. 2d 645, 655 (E.D.N.Y. 2000), *aff'd*, 11 F. App'x 11 (2d Cir. 2001) (summary order).

---

[8] Because Plaintiffs have not established an underlying Fourth Amendment violation, the Court need not decide whether the particular post-removal conduct challenged under the Fourth Amendment is independently attributable to municipal policy under *Monell*. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

The Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). To that end, "[a] property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick v. Township of Scott*, 588 U.S. 180, 185 (2019).

A direct governmental appropriation of private property is a physical taking. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (explaining that "[t]he essential question . . . is whether the government has physically taken property for itself or someone else — by whatever means"). That rule applies to personal property as well as real property. *See Horne v. Dep't of Agric.*, 576 U.S. 351, 358 (2015) ("The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home."). The Takings Clause also protects interests short of full title. Most relevant here, a lien is "compensable property." *Armstrong*, 364 U.S. at 48 (holding that "[t]he total destruction by the Government of all value of . . . liens . . . ha[d] every possible element of a Fifth Amendment 'taking'"); *see Ford*, 503 F.3d at 191 ("A secured creditor has . . . the property right to the collateral that secures the debt in the event of non-payment." (emphasis omitted)).

A compensable taking must also be for "public use." U.S. Const. amend. V; *see Kelo v. City of New London*, 545 U.S. 469, 477 (2005) (evaluating "whether a city's decision to take property for the purpose of economic development satisfie[d] the 'public use' requirement of the Fifth Amendment"). That requirement is construed broadly. *Kelo*, 545 U.S. at 483 ("For more than a century, our public use jurisprudence has wisely eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power."). A taking satisfies the public use requirement when it is "rationally related to a conceivable public purpose." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229,

241 (1984). The government need not itself retain or operate the property. *See Kelo*, 545 U.S. at 482 (explaining that the "immediate[] transfer[] [of] properties to private individuals" upon seizure by the State did not "diminish[] the public character of the taking"). Nor does a private party's receipt of the property defeat an otherwise valid public purpose. *Id.* At bottom, "it is only the taking's purpose, and not its mechanics that must pass scrutiny under the Public Use Clause." *Goldstein v. Pataki*, 516 F.3d 50, 62 (2d Cir. 2008) (quoting *Midkiff*, 467 U.S. at 244).

Finally, though state law supplies an important source for identifying the existence and contours of property rights, *see Phillips*, 524 U.S. at 164, a State cannot "sidestep the Takings Clause by disavowing traditional property interests . . . it wishes to appropriate," *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 638 (2023) (quotation marks and citation omitted). Thus, a legislature may enforce genuine "background limitations" on property, *see Cedar Point*, 594 U.S. at 160 (noting that the exercise of "traditional common law privileges to access private property" "will not amount to takings because they are consistent with longstanding background restrictions on property rights"), but it "may not transform private property into public property" merely by declaring that result, *Beckwith*, 449 U.S. at 164; *id.* ("[A] State, by *ipse dixit*, may not transform private property into public property without compensation[.]").

With those principles in mind, the Court considers when Plaintiffs' property interests were taken and whether the challenged deprivation is attributable to the City.

### B. The Public Use Requirement Is Satisfied

The City argues that, as a threshold matter, no taking could have occurred here because the Vehicles were removed and disposed of through an exercise of its police power rather than for a "public use." *See* Def. Br. at 12-14; Def. Reply at 6-7. That argument reads the public use requirement too narrowly. The relevant question is whether the appropriation is "rationally related to a conceivable public purpose." *See Midkiff*, 467 U.S. at 241; *Kelo*, 545 U.S. at 479-80

(rejecting a narrow understanding of "public use" as literal "use by the public"). The undisputed record identifies that purpose.

The City itself characterizes the DVO Policy as "promot[ing] public safety by removing dangerous vehicles from the streets of New York that are safety and health hazards and[] lead[ing] to improved traffic patterns by removing encumbrances in streets and intersections." Pls. RSUF ¶ 9. And pursuant to the DVO Policy, the City removes derelict vehicles from public streets and uses contractors to complete the final dismantling and disposal of those vehicles. Def. RSUF ¶ 85. When asked why it was necessary for the City to take ownership of derelict vehicles as part of the DVO Policy if public safety could be addressed simply by removing the vehicles from the street, the City's representative agreed that "the City becomes the owner so it can dispose of the vehicle by giving it to the contractor." Scully Dep. at 117:10-25. The City thus acquired ownership and transferred title to its contractor free of prior encumbrances as part of the mechanism for finally disposing of vehicles removed through its derelict vehicle program. The acquisition and transfer of title are therefore rationally related to a public purpose. *See, e.g.*, *City of Yonkers*, 2024 WL 4817649, at *12 ("Yonkers' deeming the vehicle abandoned pursuant to VTL § 1224 was an exercise of police power that suffices as a public use under the Takings Clause."); *Inc. Vill. of Hempstead*, 2026 WL 2719971, at *7 (concluding that "transferring [title to] unclaimed vehicles to [towing company] and other contractors is rationally related to th[e] [public] purpose" of "ensur[ing] that illegally parked or abandoned vehicles are cleared from [defendant's] roadways"); *see also* Def. Br. at 13 ("[T]he removal of abandoned, derelict cars is a valid exercise of the City's police powers[.]"); *Midkiff*, 467 U.S. at 240 ("The 'public use' requirement is . . . coterminous with the scope of a sovereign's police powers."); *accord Goldstein v. Pataki*, 488 F. Supp. 2d 254, 280 (E.D.N.Y. 2007), *aff'd*, 516 F.3d 50 (2d Cir. 2008). The contractors' receipt of the Vehicles does not change that conclusion. *See Kelo*, 545

U.S. at 482 (explaining that a private party's benefit from a transfer does not defeat an overarching public purpose). The City's acquisition and transfer of title to the Vehicles therefore satisfies the public use requirement.

**C. The Initial Towing of the Vehicles Did Not Effect a Compensable Taking**

That said, the initial removal of the Vehicles from the street did not itself effect a compensable taking. Plaintiffs concede "that the removal of the Vehicles from the street was reasonable." Pls. Reply at 19 (emphasis omitted); *but see id.* at 17 ("[O]nce [the City] exercised its police power to seize Honda's Vehicles, a taking occurred as a matter of law."). And a lawful temporary impoundment does not necessarily invade a property right protected by the Takings Clause.

As discussed, *Cedar Point* recognizes that property rights incorporate certain "traditional common law privileges to access private property," including historically recognized governmental authority to enter or interfere with property in specified circumstances. 594 U.S. at 160-61 (describing such privileges as "background limitations" on property rights). Applying that principle to vehicle impoundments, courts in this District have concluded that lawful seizures consistent with state law and the Fourth Amendment "did not invade a traditional property right such that [they] caused a physical taking." *Mercedes-Benz*, 770 F. Supp. 3d at 663; *accord Santander Consumer USA, Inc. v. City of New York*, No. 21-cv-08529 (VSB), 2025 WL 3019777, at *13 (S.D.N.Y. Oct. 29, 2025); *cf. Cedar Point*, 594 U.S. at 161 ("Because a property owner traditionally had no right to exclude an official engaged in a reasonable search, government searches that are consistent with the Fourth Amendment and state law cannot be said to take any property right from landowners." (citation omitted)). The Third Circuit has reached the same conclusion where a municipality lawfully impounded a vehicle but did not acquire title or extinguish the lessor's ownership interest. *See Honda Lease Tr. v. Malanga's Auto.*, 152

F.4th 477, 482, 489-90 (3d Cir. 2025) (holding that a lawful seizure and retention of leased vehicle did not constitute a physical taking where the government did not appropriate the lessor's property interest).

The same reasoning applies here. The City's initial act of removing the Vehicles from the streets but did not, standing alone, extinguish Plaintiffs' ownership or lien interests. The permanent deprivation occurred later, when the City treated the Vehicles as its own and transferred them free of prior property interests for dismantling and disposal. Thus, Plaintiffs do not have a viable Takings Clause claim with respect to the initial towing of the Vehicles.

**D. The Subsequent Transfers of Title Free of Previous Property Interests**

The Court's inquiry does not, however, stop there. *Inc. Vill. of Hempstead*, 2026 WL 2719971, at *8 ("[A] lawful confiscation does not insulate the state from takings liability for its continued retention and later transfer of property."). Unlike the municipalities in *Mercedes-Benz* and *Santander*, the City subsequently treated each Vehicle as its property, transferred title to its contractor "free of any other previous property interests," and caused the Vehicles to be dismantled. *See* Def. RSUF ¶ 85(G)-(H). The Takings Clause consequences differ at those stages and, for purposes of *Monell*, depend on whether state law compelled the particular deprivation of the particular property interest. The Court will address Plaintiffs' two distinct property interests: title interests and perfected lien interests.

*1. HVT's and HLT's Title Interests*

HVT held title to the Beatty, Rodriguez, Salgado, and Jones Vehicles, while HLT held title to the Philbert Vehicle. *See* Def. RSUF ¶¶ 47, 51, 54, 58, 61, 65, 68, 72, 75, 79. Pursuant to the DVO Policy, after the Vehicles were identified as derelict and removed from the streets, the City took ownership of them in accordance with Section 1224(2). *See* Scully Dep. at 21:21-25 ("[O]nce the vehicle is removed from a city street that's deemed derelict and abandoned, the City

takes ownership of it, and then once the City takes ownership of it, brings it back to the contractor's [tow] yard[.]"); *id.* at 107:11-16; VTL § 1224(2). The City then transferred title to the Vehicles to its contractor so that they could be dismantled. *See* Scully Dep. at 22:2-7, 77:6-8; Pls. RSUF ¶ 26; Def. RSUF ¶ 85(G)-(H). Whether the City may be held liable for taking those title interests depends on whether Section 1224(2) actually vested ownership in the City.

a. Section 1224(2) and *Monell* Liability

Where Section 1224(2) did not vest ownership in the City, the City's appropriation of a title interest falls comfortably within the Takings Clause. A government physically appropriates property when it takes the "property for itself or someone else — by whatever means." *Cedar Point*, 594 U.S. at 149. Treating a privately owned vehicle as City property and transferring ownership of that vehicle to a third party is such an appropriation. *See, e.g.*, *Inc. Vill. of Hempstead*, 2026 WL 2719971, at *2, *6 (concluding that the defendant "committed an unlawful Fifth Amendment taking when it transferred [title to] the [vehicle] to [a towing company] without compensating" the plaintiff).

The more difficult question is whether a particular transfer of title is mandated by Section 1224 or can instead be attributed to the City's conscious choice. The answer depends on the Vehicle's value.

Under Section 1224(2), if a Vehicle satisfied the statute's abandonment requirements, bore no license plate, and had a wholesale value of $1,250 or less, "ownership shall immediately vest in the local authority having jurisdiction thereof." VTL § 1224(2). That is to say, if the statutory predicates were satisfied, state law itself mandated the transfer of ownership.

When state law commands a particular consequence, the municipality has made no "conscious choice" to impose that consequence. *Vives*, 524 F.3d at 353 ("Freedom to act is inherent in the concept of 'choice.'"); *see Juzumas*, 33 F.4th at 688-89 (holding that "mandatory

[statutory] language ends [the court's] inquiry" as to municipal responsibility for the required conduct). Thus, if a Vehicle to which HVT or HLT had title had a wholesale value of $1,250 or less and otherwise satisfied Section 1224(2), the resulting vesting of title in the City (and corresponding extinguishment of HVT's and HLT's title rights) cannot be attributed to an independent City policy.

A Vehicle worth more than $1,250 presents the opposite situation. Section 1224(2)'s immediate vesting rule would not have applied to that Vehicle. Instead, the Vehicle would have been subject to the notice process outlined in Section 1224(3). *See* VTL § 1224(3)(a)-(b) (requiring the City to "make an inquiry concerning the last owner of such vehicle" and "notify the last owner" as well as any known "lienholder or mortgagee" "that the vehicle in question has been recovered as an abandoned vehicle"). It is undisputed that the City did not employ that process for any of the Vehicles. *See* Def. RSUF ¶¶ 83-84.

For a Vehicle above the statutory threshold, then, the City's decisions to take ownership of the Vehicle and to subsequently transfer title to its contractor were municipal choices rather than acts compelled by Section 1224(2). The City had no statutory entitlement to ownership at the moment it treated the Vehicle as its own because it failed to provide the statutorily mandated process. *Vives* therefore poses no obstacle to municipal liability where the value of a Vehicle exceeded $1,250. *See* 524 F.3d at 353 (recognizing potential municipal liability where the municipality retains freedom to choose the challenged course of action).

The City's reliance on *Bennis v. Michigan*, 516 U.S. 442 (1996), does not alter that conclusion. *See* Def. Br. at 12. The Supreme Court held in *Bennis* that "[t]he government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain." 516 U.S. at 452. But that holding assumes a lawful antecedent acquisition. The defendant-State in *Bennis*

obtained the automobile at issue through a forfeiture proceeding after establishing the statutory basis for forfeiture. *See id.* at 443-45, 452-53 (upholding the transfer of property effected by a forfeiture proceeding). Here, if a Vehicle exceeded the $1,250 ceiling, Section 1224(2) never vested title in the City. The City therefore would *not* have already lawfully acquired that Vehicle when it treated the Vehicle as its own. *See Inc. Vill. of Hempstead*, 2026 WL 2719971, at *7 (distinguishing *Bennis* where the municipality acquired and conveyed a vehicle without "comply[ing] with the Due Process Clause" and "without any similar adjudication" to that in *Bennis*).

Resolution of the Fifth Amendment claim as to the titled Vehicles accordingly turns on their value. Plaintiffs' expert places the Beatty, Rodriguez, Jones, and Philbert Vehicles above the $1,250 threshold. *See* Fallati Rep. at 3. The City disputes those estimates and maintains that each Vehicle qualified for immediate vesting under Section 1224(2) because their value was less than $1,250. Def. RSUF ¶¶ 91, 95. That factual dispute is material because it determines the source of the title transfer. If the factfinder concludes that one of those Vehicles had a wholesale value of $1,250 or less, the vesting consequence arose from state law, and the City cannot be subject to *Monell* liability for that transfer. Conversely, if the Vehicle exceeded the $1,250 threshold, Section 1224(2) did not vest ownership in the City, and Plaintiffs would have a viable Fifth Amendment claim. Summary judgment as to those Vehicles is therefore inappropriate. Both parties' motions are denied as to the Fifth Amendment claim regarding the Beatty, Rodriguez, Jones, and Philbert Vehicles because fact issues exist as to the value of those Vehicles.

b. <u>Plaintiffs' Claims Regarding the Salgado Vehicle Are Barred Under *Vives*</u>

The Salgado Vehicle is different. Plaintiffs' own expert valued the Salgado Vehicle at $250, well below Section 1224(2)'s $1,250 ceiling. *See* Fallati Rep. at 3; Def. RSUF ¶ 91. The

City likewise determined that the Vehicle fell below the threshold. *See* Def. RSUF ¶ 95; Pls. RSUF ¶ 119. Although the City disputes Plaintiffs' valuation methodology more generally, Def. RSUF ¶¶ 87, 92, 94-95, no party identifies evidence from which a reasonable factfinder could conclude that the Salgado Vehicle exceeded Section 1224(2)'s $1,250 threshold. On this record, Section 1224(2) mandated the transfer of HVT's title to the City. *See* VTL § 1224(2). The Court therefore grants the City summary judgment on the Fifth Amendment claim concerning the Salgado Vehicle and denies Plaintiffs' cross-motion for the same. *See Juzumas*, 33 F.4th at 688-89 (finding no *Monell* liability where statute mandated the municipality's actions).

*2. AHFC's Perfected Lien Interests*

Moving next to liened Vehicles, AHFC held perfected liens on the Khan, Smith, Vasquez, and Griffin Vehicles. *See* Def. RSUF ¶¶ 20, 28, 36, 44.[9] As to these liens, the relevant deprivation occurred when the City transferred the liened Vehicles free of prior property interests and authorized its dismantling. *Id.* ¶ 85(G)-(H). That "total destruction by the [City] of all value of th[o]se liens ha[d] every possible element of a Fifth Amendment 'taking.'" *Armstrong*, 364 U.S. at 48; *see, e.g.*, *City of Yonkers*, 2024 WL 4817649, at *12 ("[T]he process of deeming a vehicle abandoned is akin to condemnation, destroying [the lienholder-plaintiff]'s property interest in the [v]ehicle."); *Inc. Vill. of Hempstead*, 2026 WL 2719971, at *6 ("Before the conveyance [of the vehicle to a towing company], [plaintiff]'s lien entitled it to possess the [vehicle] upon specified conditions. Afterwards, that lien was worthless: title had passed to [the towing company] free of [plaintiff]'s entitlement." (citation omitted)).

---

[9] Though AHFC also held a perfected lien on the Cruz Vehicle, Def. RSUF ¶ 12, the Court excludes that Vehicle from this list because the claims concerning it are time-barred, *see supra* Section I.B.

Here again, the City's invocation of *Bennis* does not shield the destruction of AHFC's liens. *See* Def. Br. at 12. Even assuming that Section 1224(2) lawfully vested title to a liened Vehicle in the City, AHFC's security interest was a separate property right in the collateral. *See Ford*, 503 F.3d at 191. Section 1224 does not require that separate interest to be extinguished when municipal title vests. *See generally* VTL § 1224. Indeed, *Armstrong* likewise involved government acquisition of title to the underlying property, but the Supreme Court nevertheless held that the resulting destruction of the plaintiff's liens was a compensable taking. 364 U.S. at 46-48. The City's extinguishing of AHFC's lien rights therefore amounted to a taking as a matter of law.

Section 1224(2) did not compel such extinguishment as to any of the Vehicles. The statute provides only that "ownership shall immediately vest in the local authority" when its prerequisites are satisfied. VTL § 1224(2). It does not address what is to become of any security interests upon that vesting. The DVO Policy fills that gap, *see* Def. RSUF ¶ 85(G), embodying a "conscious choice" by the City to destroy AHFC's property rights, *Vives*, 524 F.3d at 353. Because the free and clear transfer was a feature of the City's own practice, the destruction of AHFC's liens is attributable to municipal policy regardless of whether a particular Vehicle fell above or below Section 1224(2)'s value threshold. The Court therefore grants Plaintiffs summary judgment on their Fifth Amendment claim as to the Khan, Smith, Vasquez, and Griffin Vehicles and denies the City's cross-motion as to the same.

* * *

In sum, Plaintiffs are granted summary judgment as to their Fifth Amendment claims with respect to the Khan, Smith, Vasquez, and Griffin Vehicles, and the City is granted summary judgment as to the Salgado Vehicle. Summary judgment is denied as to the Beatty, Rodriguez, Jones, and Philbert Vehicles because a genuine dispute over their wholesale value precludes

judgment for either side. The Court determines pursuant to Rule 56(g) that, for any of those Vehicles whose wholesale value exceeded $1,250 at the relevant time, Section 1224(2) did not vest ownership in the City, and the City's subsequent extinguishment and permanent disposition of Plaintiffs' property interest effected a taking for a public purpose without compensation. If any of those Vehicles fell below the statutory threshold, then the automatic-vesting consequence arose from Section 1224(2), and the City cannot be found liable under *Monell*. The factfinder must therefore resolve the disputed value of each remaining Vehicle before final judgment may be entered on the Fifth Amendment claim.

## V. New York State Constitution Claims (Count IV)

In conjunction with their federal constitutional challenges, Plaintiffs invoke the corresponding provisions of the New York State Constitution in their Complaint. *See* Compl. ¶¶ 72-73; *see also* N.Y. Const. art. I, § 6 (due process), *id.* § 7 (takings), *id.* § 12 (search and seizure). "District courts in this circuit have consistently held that there is no private right of action under the New York State Constitution where . . . remedies are available under [Section] 1983." *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 520 (S.D.N.Y. 2013) (quoting *Campbell v. City of New York*, No. 09-cv-03306 (FB) (JO), 2011 WL 6329456, at *5 (E.D.N.Y. Dec. 15, 2011)); *accord City of Yonkers*, 2024 WL 4817649, at *13; *Inc. Vill. of Hempstead*, 2026 WL 2719971, at *12; *see also Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016) (summary order) ("The New York State Constitution provides a private right of action where remedies are otherwise unavailable at common law or under § 1983."). Here, Section 1983 supplies Plaintiffs with an adequate vehicle for the federal constitutional injuries arising from the same conduct.

The Court therefore grants the City summary judgment on Plaintiffs' New York State Constitution claims.[10]

## VI. Remedies

Having addressed the merits of Plaintiffs' constitutional claims, the Court now turns to Plaintiffs' requested relief. Plaintiffs seek compensatory damages, declaratory relief, and a permanent injunction. Pls. Mot. at 1. They contend that their expert's valuation of the Vehicles establishes compensatory damages as a matter of law and that declaratory and injunctive relief remain necessary notwithstanding the City's adoption of the Revised Rule. *See* Pls. Br. at 23-25; Pls. Reply at 23-26. The City disputes Plaintiffs' valuation methodology and argues that the Revised Rule moots any prospective relief. *See* Def. Br. at 17-20, 24-25; Def. Reply at 9-11. The Court concludes that Plaintiffs are entitled to nominal damages on their procedural due process claim as a matter of law, but genuine disputes of fact preclude determining compensatory damages on summary judgment. The Court further finds that Plaintiffs' requests for prospective declaratory and injunctive relief are moot or unavailable as a matter of law and declines, in its discretion, to enter a separate retrospective declaratory judgment concerning conduct already resolved by the Court's summary judgment rulings.

---

[10] Plaintiffs' motion seeking "summary judgment on all counts in their Complaint," Pls. Mot. at 1, encompasses Count IV; the City, however, does not move on that Count, *see* Def. Mot. And neither party addresses Plaintiffs' New York State Constitution claims in its briefing. *See generally* Pls. Br.; Def. Br.; Pls. Reply; Def. Reply. Any grant of summary judgment in favor of the City on Count IV would therefore be *sua sponte*. That said, Plaintiffs conceded at oral argument that their New York State Constitution claims "rise and fall" with their federal claims. Tr. at 23:11-23. And "a *sua sponte* grant of summary judgment against [a] party may be appropriate if th[e] materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law. In other words, when the moving party cannot plausibly claim that, had it been given notice of the district court's consideration of summary judgment against it, it would have brought forth additional evidence, the district court's failure to give notice is harmless[.]" *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 140 (2d Cir. 2000) (citation omitted). Such is the case here.

### A. Damages

Plaintiffs seek "$29,937.44" in compensatory damages based on their expert's estimate of the value of the Vehicles. Pls. Br. at 23. They emphasize that the City's "opposition contains no statement of value whatsoever" and contend that the City's objections therefore do not create a genuine factual dispute. Pls. Reply at 25. The Court disagrees.

As noted throughout this Opinion, the parties genuinely dispute the value of the Vehicles. The City's position is that its determination that a Vehicle qualified for treatment under Section 1224(2) necessarily reflected a conclusion that the Vehicle's wholesale value did not exceed the statutory threshold. *See* Def. RSUF ¶¶ 85(A), 91, 95. The City also challenges the methodology of Plaintiffs' expert, contending that Fallati valued individual components he incorrectly assumed were undamaged rather than the wholesale value of each Vehicle as a whole. *See id.* ¶¶ 91-92, 94. Given these arguments, the City need not propose a damages calculation of its own to create a genuine dispute of fact. *Cf. PRCM Advisers LLC v. Two Harbors Inv. Corp.*, No. 20-cv-05649 (LAK) (BCM), 2025 WL 1276513, at *23 (S.D.N.Y. May 2, 2025) ("A non-damages expert may permissibly offer opinion evidence to rebut a damages expert's conclusions."); *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 140 (S.D.N.Y. 2022) ("[A] rebuttal expert need only attack the models or methods of the other party's expert, and has no burden to identify alternative or better methodologies[.]" (citation modified)). On the record before the Court, a reasonable factfinder could reject Plaintiffs' proposed valuations.

Plaintiffs' request for summary judgment on its compensatory damages request is therefore denied. Plaintiffs are, however, entitled to nominal damages on their procedural due process claim. *See Carey v. Piphus*, 435 U.S. 247, 266-67 (1978) ("[T]he denial of procedural due process should be actionable for nominal damages without proof of actual injury."). Whether Plaintiffs are entitled to compensatory damages, and in what amount, remains for trial.

**B. Declaratory Judgment**

Plaintiffs also seek a declaration that the DVO Policy violated the Constitution. Pls. Br. at 24. They ask the Court to declare unconstitutional the DVO Policy's failure to provide individualized notice, its failure to provide an opportunity for a hearing before the appropriation or destruction of existing property interests, and its failure to compensate lessors and lienholders when their property was taken. *Id.*

To the extent Plaintiffs seek prospective declaratory relief governing the City's future conduct, that request is moot for substantially the same reasons discussed below with respect to the requested injunction. *See infra* Section VI.C. The DVO Policy has been superseded by the formally promulgated Revised Rule, which now provides notice and an opportunity to challenge the removal and disposition of vehicles. Pls. RSUF ¶¶ 135-40.

To the extent Plaintiffs instead seek a retrospective declaration concerning the constitutionality of the City's past conduct, the Court declines to enter one. The Declaratory Judgment Act is permissive: a court "*may* declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a) (emphasis added). Indeed, "[t]he permissive language of the Declaratory Judgment Act has been 'consistently interpreted as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear.'" *Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 39-40 (S.D.N.Y. 2010) (omission adopted) (quoting *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003)). The Second Circuit has held that "the following considerations, to the extent they are relevant in a particular case, should inform a district court's exercise of such discretion: (1) whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether such a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is

being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a better or more effective remedy; and (6) whether concerns for judicial efficiency and judicial economy favor declining to" grant such relief. *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99-100 (2d Cir. 2023) (citation modified). Here, the Court's merits rulings already determine the parties' legal rights arising from the challenged conduct. Judicial efficiency counsels in favor of declining to grant a separate declaration restating that conclusion, as such a declaration would provide no meaningful additional relief or resolve any remaining uncertainty between the parties. The remaining factors are not relevant to this case. Plaintiffs' request for declaratory relief is therefore denied.

**C. Permanent Injunction**

Finally, Plaintiffs request a permanent injunction prohibiting the City from continuing the challenged conduct. *See* Pls. Br. at 25; Pls. Reply at 25-26. "On March 16, 2026, the City implemented a new rule which amended the DVO [P]olicy to include a notice and redemption process for all parties with interests in vehicles removed by DSNY." Def. Reply at 9; *see* Revised Rule at 8; *see also* Pls. RSUF ¶ 134 (noting that the Revised Rule was "promulgated" "[o]n January 23, 2026"). The Revised Rule provides notice "to ascertainable owners and interested parties," permits redemption, and establishes a hearing process through which an interested party may challenge the City's action before final disposition. *See* Pls. RSUF ¶¶ 135-40; *see generally* Revised Rule. Those provisions directly address the absence of notice and

review that rendered the DVO Policy constitutionally deficient, thereby mooting Plaintiffs' request for injunctive relief on their Fourteenth Amendment claim.[11]

On reply, Plaintiffs invoke the voluntary cessation exception, arguing that future City officials remain free to restore the former regime. Pls. Reply at 25-26. The Court is unpersuaded. Although "a defendant claiming that its voluntary compliance moots a case" ordinarily "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000), the challenged practice here was replaced through formal rulemaking rather than an informal litigation promise. The Second Circuit has recognized that such formal governmental changes can moot prospective relief where there is no reason to expect a return to the former regulatory regime. *See Granite State Outdoor Advert., Inc. v. Town of Orange*, 303 F.3d 450, 451-52 (2d Cir. 2002) (per curiam) ("[T]here is no reason to think that, having completely revised its regulations through proper procedures, the Town has any intention of returning to the prior regulatory regime."); *see also Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 377 (2d Cir. 2004) (finding that amendment to town ordinance rendered certain claims moot); *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014) (concluding that amendment to directive mooted request for injunctive relief).

Any return to the former DVO Policy would require affirmative governmental action, and Plaintiffs identify no evidence suggesting that such action is reasonably likely. The possibility

[11] To the extent the Revised Rule may still effect a taking, equitable relief is not an appropriate remedy. *See Knick*, 588 U.S. at 201 ("Today, because the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable. As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking.").

that the City might repeal or materially alter the Revised Rule is simply too speculative. Plaintiffs' request for a permanent injunction is therefore denied.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendant summary judgment on Plaintiffs' Fourth Amendment and New York State Constitution claims, as well as all claims concerning the Cruz Vehicle; GRANTS Plaintiffs summary judgment on their Fourteenth Amendment claim with respect to all Vehicles other than the Cruz Vehicle, as well as nominal damages on the same; GRANTS Plaintiffs summary judgment on their Fifth Amendment claim regarding the Khan, Smith, Vasquez, and Griffin Vehicles; and GRANTS Defendant summary judgment on the Fifth Amendment claim concerning the Salgado Vehicle. The parties' motions are otherwise DENIED. The Clerk of Court is respectfully directed to terminate the motions at Dkts. 43 and 53.

A bench trial in this matter on the remaining claims and damages shall commence on **October 21, 2026, at 9:00 a.m.** The parties' joint pretrial order and other pretrial submissions required under the Court's Individual Rules are due by **October 13, 2026**. The final pretrial conference will be held on **October 20, 2026, at 1:00 p.m.** in Courtroom 20B of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007.

Dated: September 28, 2026
New York, New York

SO ORDERED.

Jennifer Rochon

JENNIFER L. ROCHON
United States District Judge